UNITED STATES of America, Appellee,

v.

Yvette CARSON, Lemuel Mont, a/k/a "Lam," and Kenneth Thomas, a/k/a "Kenneth Davis," Defendants-Appellants.

Nos. 149, 150, 151, Dockets 82–1109, 82–1113, 82–1115.

United States Court of Appeals, Second Circuit.

Argued Oct. 19, 1982.

Decided March 4, 1983.

Certiorari Denied June 6, 1983. See 103 S.Ct. 2456, 2457.

---

Patricia Anne Williams, New York City (John S. Martin, Jr., U.S. Atty. for the S.D.N.Y., Roanne L. Mann and Walter P. Loughlin, Asst. U.S. Attys., New York City, on brief), for appellee.

Victor J. Herwitz, New York City, for defendant-appellant Carson.

Barry A. Schwartz, New York City (Hermena Perlmutter and Salvatore A. Quagliata, New York City, of counsel), for defendant-appellant Mont.

Michael Young, New York City, for defendant-appellant Thomas.

Before OAKES and WINTER, Circuit Judges, and MacMAHON,[*] District Judge.

## MacMAHON, District Judge.

Yvette Carson, Lemuel Mont and Kenneth Thomas appeal from judgments of conviction entered in the United States District Court for the Southern District of New York after a four-week jury trial before Honorable Charles L. Brieant, *Judge.*

The fifteen-count indictment charged Carson, Mont, Thomas and sixteen co-defendants with violations of the federal narcotics laws. Count I charged all defendants with conspiracy to distribute heroin and to possess it with intent to distribute from June 1980 until October 1981, in violation of 21 U.S.C. § 846 (1976).[1] The remaining counts (Counts 2 through 15) charged vari-

ous defendants with distribution of heroin and possession with intent to distribute, in violation of 21 U.S.C. §§ 812, 841(a)(1), (b)(1)(A) (1976), and 18 U.S.C. § 2 (1976).[2] Carson was charged in three substantive counts (Counts 13 through 15) and Mont in seven counts (Counts 3 through 9). Thomas was named in the conspiracy count only.

Trial commenced against Carson, Mont, Thomas and co-defendant Gayburnetta Galloway.[3] At the close of the government's case, Judge Brieant dismissed Count 13 against Carson and Counts 3 through 6 against Mont and consolidated Counts 8 and 9 which named Mont.

After deliberating for three days, the jury found Carson guilty of the conspiracy count and one of the remaining substantive counts (Count 15), but found her not guilty on the other substantive count (Count 14). Mont was found guilty on the conspiracy count, the consolidated substantive count (Count 8), and the remaining substantive count (Count 7). The jury found Thomas guilty on the conspiracy count. Galloway

[*] Of the Southern District of New York, sitting by designation.

1. 21 U.S.C. § 846 provides:
 Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

2. 21 U.S.C. §§ 841(a)(1), (b)(1)(A) provide:
 (a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—
 (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; or
 (2) to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance.
 (b) Except as otherwise provided in section 845 of this title, any person who violates subsection (a) of this section shall be sentenced as follows:
 (1)(A) In the case of a controlled substance in schedule I or II which is a narcotic drug, such person shall be sentenced to a term of imprisonment of not more than 15 years, a fine of not more than $25,000, or both. If any person commits such a violation after

one or more prior convictions of him for an offense punishable under this paragraph, or for a felony under any other provision of this subchapter or subchapter II of this chapter or other law of the United States relating to narcotic drugs, marihuana, or depressant or stimulant substances, have become final, such person shall be sentenced to a term of imprisonment of not more than 30 years, a fine of not more than $50,000 or both. Any sentence imposing a term of imprisonment under this paragraph shall, in the absence of such a prior conviction, impose a special parole term of at least 3 years in addition to such term of imprisonment and shall, if there was such a prior conviction, impose a special parole term of at least 6 years in addition to such term of imprisonment.
 18 U.S.C. § 2 provides:
 (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
 (b) Whoever wilfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

3. Of the remaining fifteen defendants, eleven have pleaded guilty and are serving their sentences. Four defendants remain at large.

was found not guilty on the conspiracy count, and the jury was unable to reach a verdict as to her on the substantive count (Count 15).[4]

Viewed most favorably to the government, the proof showed a loosely-knit organization engaged in the distribution of heroin. Initially occupying the upper echelon were Fred Galloway and Fred Chaffin, who received heroin from sources identified as "the Italians" and distributed it through their network of associates. Chaffin was ultimately supplanted by Carson, who was affiliated with Guy Wilkins. Prior to his ouster in the summer of 1981, Chaffin served as both source and partner to the conspirators at the next level of distribution, Carson, Mont, and, at times, Guy Wilkins. These individuals cut heroin for further distribution and engaged in wholesale transactions as well. Carson's subordinates included her brother, Kenneth Nunes; Thomas Wilson; appellant Thomas and his brother, Howard Thomas; and the workers in Carson's cutting mill located at her residence. Wilkins' subordinates were Arthur Collins; Wilkins' brother, Michael Green; and Anthony and Philip Pegues. Working as distributors for Mont were Shawn Lovett; David Wilkins; and, prior to his advancement through the organization, Guy Wilkins. The roles of the various defendants became apparent during the course of sixteen months of undercover investigative work by agents of the Drug Enforcement Administration ("DEA"), who made fourteen purchases of high-quality heroin for approximately $151,400, and two pounds of quinine.

The principal evidence linking each appellant to the conspiracy is:

*MONT*

The evidence demonstrated that Mont was a major distributor of heroin. He was variously described as owning or operating the *Our Place Bar*,[5] a heroin marketplace. Thus, on several occasions, Guy Wilkins sold heroin to DEA Agents Baker, Coleman and Williams at or in the vicinity of the *Our Place Bar*. On August 13, 1980, Wilkins sold a sample to the agents and informed them that he and his brother, David Wilkins, received their heroin from the same source—the owner of the *Our Place Bar*.[6] During this sale, the agents indicated that they could sell quinine to Wilkins' source, and Wilkins agreed to arrange a meeting between his source and the agents. On September 29, 1980, Guy Wilkins sold the agents two ounces of heroin for a price of $20,000 at the *Our Place Bar*.

Mont's heavy involvement in the heroin business was solidly shown by his dealings with the agents in October 1980. On October 3, Agents Baker and Coleman met with Mont at the *Our Place Bar*, and he agreed to purchase liquor from them.[7] En route to Queens to pick up the liquor, Baker told Mont that he was unhappy with the Wilkins brothers and was seeking a reliable source of heroin. Baker also offered to sell some quinine. Mont replied that he had heroin connections and could supply the four ounc-

---

4. Judge Brieant sentenced Carson to consecutive terms of imprisonment of fifteen and five years on Counts 1 and 15, respectively, to be followed by a special parole term of three years. Mont was sentenced as a second felony offender, pursuant to 21 U.S.C. § 851, to concurrent terms of imprisonment of thirty years on Counts 1, 7 and 8, to be followed by lifetime special parole. Thomas was sentenced to fourteen years on Count 1. Gayburnetta Galloway entered into a deferred prosecution agreement with the government following trial with respect to the substantive charge.

5. The *Our Place Bar* was legally owned by an entity whose sole officer was Hope Haynes, a friend of Mont. Mont described himself as a bar owner on an application for an account with a brokerage firm. After his arrest, Mont told the agents that he was a bar manager.

6. On August 12, 1980, Agent Coleman unsuccessfully attempted to pick up the heroin sample. Upon arriving at the *Our Place Bar* that day, Coleman overheard Guy Wilkins speaking to an individual named "Lam" on the telephone. "Lam" was Mont's nickname, as evidenced by a bracelet he wore that read "LAM" in diamonds.

7. The possibility of selling "stolen" liquor to Mont was raised first by Agents Baker and Coleman in a September 12, 1980 meeting with Guy Wilkins. Wilkins agreed to mention the liquor to "the owner of the *Our Place Bar*."

es that Baker wanted. After picking up the liquor, they returned to the bar, where Mont paid Baker $900 for the liquor in $100 bills. The serial numbers on two of the bills matched those on two of the bills that the agents had paid to Guy Wilkins for the heroin the agents bought on September 29. Mont stated that his connection was returning that evening and that the agents should remain at the bar. After a wait of two hours, nobody appeared and the agents left.

On October 27, Mont asked Baker about the quinine that Baker had offered on October 3. Baker replied that he had ten pounds left. Mont was interested and said he would speak to his connection about selling heroin to Baker. The following day, Guy Wilkins called Agent Coleman seeking immediate delivery of a pound of quinine for David Wilkins and Mont. Wilkins stated that he, his brother David, and Mont were partners in the heroin business. That evening, Agents Baker and Williams sold the pound of quinine to Mont at the *Our Place Bar* for $400. When informed as to what Wilkins had said about Mont's partnership with Guy and David Wilkins, Mont replied that Guy Wilkins used Mont's name when Wilkins wanted "some clout in his commitments." When Baker asked Mont about purchasing heroin, Mont indicated that he would have his connection bring a sample to the bar the next day.

On the following day, October 29, Agents Baker and Coleman arrived at the *Our Place Bar,* where they observed Mont, David Wilkins and Shawn Lovett convers-

ing. David Wilkins went to the telephone, and Mont told the agents that he was trying at that very moment to get his heroin connection to bring a sample to the bar. David Wilkins and Lovett left the bar after again speaking with Mont. Guy Wilkins arrived and told the agents that he had received the quinine that they sold to Mont, that David Wilkins had given Mont the money to pay for the quinine and that Mont had recently sold David Wilkins an eighth of a kilogram of heroin.

## CARSON

Carson's role in the conspiracy was shown in a series of meetings between the conspirators and the agents. On July 21, 1981, Wilkins agreed with the agents to arrange their purchase of heroin from Fred Galloway. Subsequently, on July 25, the agents went to the *Flash Inn* at the appointed time and place. When Wilkins arrived, he was accompanied by Carson, whom he introduced as his "partner." Carson told the agents that she had met Wilkins through Fred Chaffin and acknowledged that she and Wilkins were now partners. Wilkins, Carson and Agent Johnson discussed the irony of Wilkins' dealing Carson's narcotics over a year, although neither was known to the other. Wilkins stated that Carson had an overseas heroin connection,[8] and Johnson asked Carson how it worked. Carson replied that a friend of hers had the connection, that her friend employed overweight women to carry the heroin into the country on their person, and offered to act as an intermediary between her friend and the agents if the agents wanted to buy heroin.

**8.** On July 17, 1981, Guy Wilkins told Agent Baker, when Baker inquired about sources of heroin, that he, Wilkins, had "made contact" with Carson and another woman. This "other woman," Wilkins indicated, imported the heroin. Wilkins also stated that if Baker were to meet with her, he, Baker, would not need to deal with anyone else.

At the July 17 meeting, Wilkins also stated that Chaffin, from whom the agents had bought heroin, had fallen out of favor with other conspirators because he owed over $100,000 to "the Italians" and over $58,000 to "Can Do's" (Kenneth Nunes') sister, Carson. Carson confirmed this on the morning of July 25, 1981, while driving to the *Close Encounters Discot-*

*heque,* indicating to Agent Williams that Chaffin could not be trusted because he owed people money. Chaffin, Carson said, owed her $58,000 for a heroin package, along with an additional $12,000. Later, at the discotheque, Carson told Agent Johnson that Chaffin was there because he wanted to borrow money, but that his credit was bad because he owed people money, confirming the figures that Wilkins had stated previously. According to Carson, "the Italians" had advanced $100,000 worth of heroin to Chaffin because she vouched for him, but Chaffin failed to repay them. Because of this, Carson had severed her relationship with Chaffin and taken on Wilkins as a new partner.

Agent Williams asked Carson if she knew the people whom they were going to do business with that morning. Carson stated that she did and that she had met them through her "old man."

Later that day, at *Close Encounters Discotheque,* where the sale was consummated, Carson elaborated on her role in the heroin business.[9] She told Agent Williams that her "old man" was in jail, that she was running his heroin business, and that she had to be careful because she wanted to save money to "set him up right" upon his release from prison. She also stated that she had been Chaffin's partner for quite a while and that their partnership had ended "just recently."

On July 28, 1981, Agents Johnson and Baker met with Guy Wilkins and Carson's son, Kevin, at the *Flash Inn.*[10] Wilkins stated that he and Carson each had a half-pound of heroin and needed quinine. Later that day, Johnson and Baker met with Wilkins and Carson at a *Jack-in-the-Box* restaurant in the Bronx. Carson said that she was rushed because of the presence of customers from Washington, D.C., to whom she was selling heroin. She also told Johnson that she would meet two potential sources later in the week and that she was "not too sure" about one but "85 per cent sure" of the other. Baker told Carson that he wanted to become her partner and asked her to mention him to her "Italian source," whom she planned to meet on July 30. Carson also reiterated the existence of her partnership with Wilkins.

On July 31, 1981, Agents Baker and Williams met with Wilkins, and Baker asked Wilkins what had become of Carson. Wilkins stated that Carson had visited a prison to obtain a reference for her introduction to some "Italian sources." Baker then asked if Carson had spoken to the "Italian source" regarding Baker's becoming a partner. Wilkins replied that the source had refused to meet with Baker.

The scope of Carson's involvement in the conspiracy was further evidenced in an aborted heroin transaction which took place on August 10, 1981. On that date, Agents West and Johnson met with Howard Thomas and Kenneth Nunes, Carson's brother, to purchase heroin. Nunes stated that he had to call his sister to approve the deal, then left the group and placed a telephone call. When he returned, Nunes said that his sister did not want to deal with the agents because Johnson asked "a lot of questions" the last time he met with her. On that evening, Howard Thomas also informed Agent West that Nunes was Carson's brother and that since Johnson knew Nunes, Johnson could go to Carson's house, which was the cutting mill. There, Thomas said, Carson employed six or more persons to cut and package heroin.

On August 12, 1981, Agent West, accompanied by an informant, conversed with Howard Thomas regarding Nunes' refusal to deal with the agents on August 10. Thomas indicated that Nunes had told him that Carson did not want to conduct business with Agent Johnson because the agents had asked "too many questions" on July 25. Thomas, apparently referring to the July 25 sale, also said that Carson had done a prior deal with Agents Johnson and West, and that Nunes was a runner and cutter for Carson.

### KENNETH THOMAS

Evidence tying Thomas to the conspiracy is as follows: On July 21, 1981, Agents Johnson and West negotiated with Kenneth's brother, Howard Thomas ("Howard"), for the purchase of one ounce of heroin. During the course of the negotiations outside the *Star Lounge,* the agents observed Thomas engaging in what appeared to them to be drug transactions, *i.e.,* individuals approached Thomas and gave

---

9. For a fuller description of the events of July 25, see the discussion of Carson's conviction on the substantive count, *infra.*

10. Baker and Johnson also met with Wilkins a day earlier, on July 27. Wilkins informed the

agents that Carson was unable to attend the meeting because she had to prepare for a sale of heroin to customers who had come to New York from Washington, D.C.

him money in exchange for something furtively handed to them by Thomas. Later that day, Howard introduced the agents to Thomas Wilson ("Hillside"), who sold them approximately one ounce of heroin for $8,500.

On August 6, 1981, Agents Johnson and West returned to the vicinity of the *Star Lounge,* where they asked Thomas if he could locate Howard. Thomas replied that Howard had told him what the agents wanted. Thomas then entered the agents' car and directed their search for Howard, whom they eventually found at the *Star Lounge.* Howard approached the car and Thomas left, positioning himself on a street corner. A short time later, Thomas approached Howard and attempted to hand him some money; Thomas was told to wait, and he returned to the corner. Thereafter, a woman approached Howard and asked if he "had anything;" Howard directed her to the corner where Thomas and others were standing.

On August 10, 1981, the agents again returned to the vicinity of the *Star Lounge,* where they met Howard. Howard indicated that his sources were temporarily out of heroin but would be resupplied that evening. Later, while waiting for Wilson to arrive, Howard told Agent Johnson that Wilson was one of only six or eight people who could go to the mill where the heroin was cut and that he, Howard, had been there only eight times during the past two and one-half years. While waiting, the agents watched Thomas, Howard and others engaging in numerous furtive exchanges which appeared to the agents to be narcotics transactions.

Later that evening, Howard suggested that the agents buy heroin from another source, which he indicated as someone sitting in a Lincoln Continental parked in front of the agents' car. When the agents

seemed reluctant, Howard assured them that this person's heroin was from the same source as that provided by Wilson. The agents agreed to buy the heroin from the person in the Lincoln Continental, but the transaction did not take place because Thomas, Howard and a young woman spotted a surveillance vehicle across the street, walked toward it, and stood facing the vehicle for a short time. The driver of the Lincoln Continental spoke briefly to the surveillance agent, who thereupon drove away from the area. Howard then advised the agents that there were a lot of police nearby.

On October 20, when Thomas was arrested, he had upon his person two small glass vials (one with traces of heroin and another with traces of cocaine), one cellophane bag containing traces of lactose, and several small empty cellophane bags.

## DISCUSSION

A. *Claim Common to All Appellants: Single v. Multiple Conspiracies.*

■ Mont argues that the evidence established multiple conspiracies rather than the single conspiracy charged in the indictment. Carson and Thomas adopt this argument; in addition, they challenge the sufficiency of the evidence supporting their convictions on the conspiracy count. Judge Brieant charged the jury on the issue of multiple conspiracies, and no appellant claims error in the charge. Our inquiry, therefore, is directed to whether the evidence supports the jury's finding that the government proved the conspiracy charged in Count 1 and each defendant's participation in it.[11] *United States v. Alessi,* 638 F.2d 466, 472–73 (2d Cir.1980); *United States v. Taylor,* 562 F.2d 1345, 1351 (2d Cir.), *cert. denied sub nom. Salley v. United States,* 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977).

---

11. As we have noted on many occasions, whether the evidence shows multiple conspiracies is normally a question of fact for a properly instructed jury. *United States v. Alessi,* 638 F.2d 466, 472 (2d Cir.1980); *United States v. Murray,* 618 F.2d 892, 902 (2d Cir.1980); *United States v. McGrath,* 613 F.2d 361, 367 (2d Cir.1979); *United States v. Taylor,* 562 F.2d 1345, 1351 (2d Cir.), *cert. denied sub nom. Salley v. United States,* 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977); *United States v. Armedo-Sarmiento,* 545 F.2d 785, 789 (2d Cir. 1976), *cert. denied,* 430 U.S. 917, 97 S.Ct. 1330, 51 L.Ed.2d 595 (1977).

The law regarding claims that the proof demonstrates multiple conspiracies was recently summarized by us in *United States v. Alessi, supra,* 638 F.2d at 472–73. We inquire whether the evidence

> supports a finding that the alleged conspiracy was proved and that each appellant was a member of it and, if not, whether the variance substantially prejudiced any of the appellants. Having in mind that "the gist of the offense remains the agreement," *United States v. Borelli,* 336 F.2d 376, 384 (2d Cir.1964), *cert. denied sub nom. Mogavero v. United States,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965), we must, in order to resolve these issues, examine the evidence to determine what kind of agreement or understanding could reasonably have been found to exist as to each appellant. This requires a review of the defendants' activities as a whole in order to determine the scope of the criminal enterprise or enterprises and whether any of them fits the pattern of the conspiracy alleged in the indictment. The next step is to review each appellant's conduct and statements to determine whether it could reasonably be inferred that he participated in the alleged enterprise with a consciousness of its general nature and extent. . . . Proof of an appellant's membership de-

pends upon the extent of his knowledge, given the scale of the criminal enterprise (citations omitted).

Count 1 charged the defendants with a conspiracy, extending from June 1980 through October 1981, to possess with intent to distribute and to distribute heroin. There was evidence from which the jury could have found the existence of a single conspiracy. When viewed in the light most favorable to the government, the proof showed that Fred Galloway and Fred Chaffin distributed large quantities of heroin that they received from sources identified only as "the Italians." [12] The connection between Galloway and Chaffin, on the one hand, and Guy Wilkins,[13] on the other, was evidenced during a sale of $45,000 worth of heroin to the agents on May 28, 1981. The agents paid $40,000 [14] to Wilkins, who placed it in a shoulder bag. After the sale, Chaffin entered the residence of Galloway carrying the bag but emerged shortly thereafter without it.[15] The relationship between Chaffin and Carson was admitted by Carson—by her own account, they had been partners. Moreover, Carson and Wilkins admitted to a partnership relation between them after the ties between Carson and Chaffin had been severed. It was at this time that Carson established direct connections to "the Italians." The outlines of the

**12.** The importance of the "Italian connection" was illustrated in May 1981, when heroin was in short supply. On May 20, Guy Wilkins informed the agents that there was no heroin available because of the death of one of "the Italians" and a resulting reorganization. The reorganization, Wilkins said, involved Chaffin and a friend of Chaffin's, for whom "the Italians" had purchased a discotheque in Westchester County. On May 27, 1981, Wilkins and Chaffin each told the agents that Chaffin had two partners with direct connections to "the Italians" and that these partners received their heroin in fifteen-kilogram lots. Later, on July 17, 1981, Wilkins told the agents that Fred Galloway received his heroin from the same source—"the Italians"—as Chaffin did.

**13.** Initially, Guy Wilkins sold the agents heroin that he had obtained from Mont and David Wilkins. However, David Wilkins, suspecting that the agents were agents, was reluctant to deal with them, and Guy Wilkins began searching for new sources of heroin. Guy Wilkins found his new source in Chaffin, and together

they dealt with the agents from November 1980 to June 1981. Thereafter, Chaffin fell out of favor with "the Italians" and others, and Guy Wilkins began his partnership with Carson.

Additional evidence of a Guy Wilkins-Fred Galloway connection is an aborted sale of quinine by the agents to Galloway, which took place on August 4, 1981. On that date, Agents Baker and Johnson, along with Guy Wilkins, delivered a barrel of quinine to the *Close Encounters Discotheque.* Galloway, refusing to speak directly with the agents, sent word through Wilkins that he did not need quinine at that time and preferred cash payments for heroin.

**14.** The remaining $5,000 was paid on June 23, 1981.

**15.** Thereafter, Chaffin, Wilkins and an unidentified female drove to the residence of Carson, from which Chaffin and Wilkins emerged after a short period of time.

conspiracy at its lower levels was also established at trial: Mont served as source and partner to David Wilkins, and as a source to Guy Wilkins prior to his rise through the organization. Moreover, there is evidence that Carson operated a heroin mill out of her home and employed "Hillside," the Thomas brothers and others as lower-level distributors.

Denying any connection between Chaffin and himself and claiming that Guy Wilkins had multiple unrelated sources, Mont argues that the proof showed multiple conspiracies. There was evidence, however, from which a Mont-Chaffin connection could be found. Thus, in October 1980, when Wilkins introduced Chaffin to the agents as his new source, Wilkins, nevertheless, indicated that Mont and Chaffin were affiliated and further stated that Mont and David Wilkins did not wish to be cut out of their profit as intermediaries. This suggests strongly that Mont had been receiving heroin from Chaffin. Moreover, on February 23, 1981, Shawn Lovett, who worked for David Wilkins, spoke with Chaffin immediately prior to picking up a kilogram of heroin for David. During this period, Mont and David Wilkins were partners in the heroin business. Finally, both Carson and Guy Wilkins acknowledged the irony of Wilkins' dealing Carson's narcotics for over a year when neither knew the other personally. During this period, Wilkins was distributing heroin for Mont and Carson was Chaffin's partner.

In any event, there was substantial cooperation between Mont and Guy Wilkins even after Wilkins established his relationship with a "new" source of heroin, Chaffin, in October 1980. Wilkins obtained some of the quinine that Mont and David Wilkins had purchased from the agents and used it to cut heroin he received from Chaffin. David's arrangement to pick up heroin from Chaffin in February 1981 further demonstrates the mutual assistance between Mont and David Wilkins, on the one hand, and Chaffin and Guy Wilkins on the other. In short, the proof at trial "revealed the existence of ... unlawful operations by functional interlocking groups ... who were virtually dependent on one another for overall success." *United States v. Alessi, supra,* 638 F.2d at 473. The inference that there was one loose-knit conspiracy as alleged is justified. *See United States v. Panebianco,* 543 F.2d 447, 452–53 (2d Cir. 1976), *cert. denied,* 429 U.S. 1103, 97 S.Ct. 1128, 51 L.Ed.2d 533 (1977); *United States v. Tramunti,* 513 F.2d 1087, 1106–07 (2d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975); *United States v. Sperling,* 506 F.2d 1323 (2d Cir.1974); *United States v. Bynum,* 485 F.2d 490, 495–97 (2d Cir.1973), *vacated and remanded on other grounds,* 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974).

█ Turning to appellants' knowledge and participation, there was sufficient evidence to sustain the jury's conviction of Mont, Carson and Thomas on the conspiracy charge. The proof shows that Mont conducted a substantial heroin business from the *Our Place Bar.* In addition to the transactions outlined above, there was testimony from which the jury could infer that Wilkins and his brother David received from Mont and sold a kilogram of heroin every week. Moreover, in his conversation with Agent Baker, Mont indicated that he anticipated no problem in satisfying Baker's demands for heroin. Mont had subordinates, such as David and Guy Wilkins, who assisted him in the distribution chain. Mont also observed the advancement of Guy Wilkins through the organization, providing him with assistance in the form of quinine. The evidence, therefore, sustains the jury's finding that Mont had knowledge of the outlines of the enterprise, *United States v. Alessi, supra,* 638 F.2d at 474, and "knew from the scope of [its] operation that others were involved in the performance of functions vital to the success of the business." *United States v. Sisca,* 503 F.2d 1337, 1345 (2d Cir.), *cert. denied,* 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974) (quoting *United States v. Bynum, supra,* 485 F.2d at 496; *United States v. Calabro,* 467 F.2d 973, 982–83 (2d Cir.1972), *cert. denied,* 410 U.S. 926, 93 S.Ct. 1358, 35 L.Ed.2d 587 (1973)). The government, of

course, was under no obligation to show that Mont "knew every other member or was aware of all acts committed in furtherance of it." *United States v. Alessi, supra,* 638 F.2d at 473.[16]

Regarding Carson's involvement, she was, by her own admission, a partner of Chaffin, and then Wilkins, in the heroin trade. Carson's initial partnership with Chaffin dissolved after Chaffin became substantially indebted to both Carson and "the Italians." She also admitted dealing directly with customers from Washington, D.C. Moreover, the evidence showed that Carson used her residence as a cutting mill, where six or more people diluted and packaged heroin, and that she employed Hillside and the Thomas brothers as lower-level distributors. The jury was warranted in concluding that Carson knowingly participated in the conspiracy.

■ Evidence of Thomas' participation in the conspiracy is less compelling. However, the standard for appellate review of an insufficiency claim placed a "very heavy burden" on the appellant. *United States v. Losada,* 674 F.2d 167, 173 (2d Cir.), *cert. denied,* 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982). Our inquiry is whether the jury, drawing reasonable inferences from the evidence, may fairly and logically have concluded that the defendant was guilty beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 317, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560, 572 (1979); *United States v. Barnes,* 604 F.2d 121, 157 (2d Cir.1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980). In making this determination, we must view the evidence in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704 (1942), and construe all permissible inferences in its favor, *United States v. Dazzo,* 672 F.2d 284, 288 (2d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 81, 74 L.Ed.2d 77 (1982). Moreover, participation in a conspiracy may be proven by circumstantial evidence. *See United States v. Barnes, supra,* 604 F.2d at 156 and cases cited therein. Applying these standards, we hold that the evidence supporting Thomas' guilt on the conspiracy charge is sufficient.

■ Indicative of Thomas' membership in the conspiracy were, of course, his furtive street-corner activities, which the jury could infer were drug transactions. Although this proof, taken alone, is insufficient to support the conclusion that Thomas was dealing conspiracy heroin, there is more. Thomas' activities on August 6, 1981 are of great significance. The agents, as noted above, were looking for Howard Thomas pursuant to a prearranged agreement to purchase heroin from him. Fully aware of the agents' purpose, because Howard had told him, Thomas successfully assisted the agents in their search. From this, the jury was entitled to conclude that Thomas was knowingly facilitating a heroin sale between Howard Thomas and the agents.

The same conclusion could be drawn with respect to Thomas' participation in an aborted heroin sale on August 10. On that occasion, Thomas, along with Howard

---

**16.** Mont argues that "the record is conspicuously silent of [sic] even the slightest reference to Mont from October 31, 1980 to October 4, 1981, the day Mont was arrested" (reply brief at 14). However, it is well settled that "participation in a conspiracy may continue beyond the performance of an overt act by the alleged conspirator, if the conspiracy continues in existence thereafter," *United States v. Cianchetti,* 315 F.2d 584, 589 (2d Cir.1963), and that a turnover in personnel does not necessarily terminate a conspiracy, *United States v. Panebianco,* 543 F.2d 447, 453 (2d Cir.1976), *cert. denied,* 429 U.S. 1103, 97 S.Ct. 1129, 51 L.Ed.2d 553 (1977) (citing cases). In *United States v. Stromberg,* 268 F.2d 256 (2d Cir.), *cert. denied,* 361 U.S. 863, 80 S.Ct. 123, 44 L.Ed.2d 102 (1959), neither a year-long hiatus in the government's evidence nor the absence of mention of the appellants in the post-hiatus evidence required reversal of appellants' convictions. *Id.* at 263–64. And in *United States v. Brewer,* 630 F.2d 795 (10th Cir.1980), the conviction was affirmed despite the fact that the appellant disappeared from the conspiracy when his narcotics supplier and his customer began dealing directly. *Id.* at 799–800. That the agents' investigation did not focus on Mont after October 1980 is irrelevant to the question whether the evidence demonstrates that Mont knowingly participated in the conspiracy charged in the indictment.

Thomas and an unidentified woman, approached and stared at a DEA agent parked across the street from the heroin seller who occupied the Lincoln Continental. Thereafter, Howard cautioned the agents concerning the police presence. This "seemingly innocent act, when viewed in the context of surrounding circumstances," justified "an inference of complicity." *United States v. Calabro,* 449 F.2d 885, 890 (2d Cir.1971), *cert. denied,* 404 U.S. 1047, 92 S.Ct. 728, 30 L.Ed.2d 735 (1972). When this evidence of knowing assistance is viewed in conjunction with Thomas' street-corner activities, which take on color in light of Howard's extensive heroin dealing, *United States v. Tramunti, supra,* 513 F.2d at 1108–09, it was reasonable for the jury to conclude that Thomas was a member of the conspiracy, albeit at the retail level. This inference is strengthened upon consideration of evidence that the location where Thomas transacted his business was a heroin market—thus, the presence on this block of the heroin supplier in the Lincoln Continental and the proximity of the grocery store operated by Howard's heroin partner, "Hillside."

■ Thomas urges exculpatory explanations for each strand of evidence. However, "pieces of evidence must be viewed not in isolation but in conjunction." *United States v. Geaney,* 417 F.2d 1116, 1121 (2d Cir.1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970). In this case, as in *United States v. Monica,* 295 F.2d 400, 401 (2d Cir.1961), *cert. denied,* 368 U.S. 953, 82 S.Ct. 395, 7 L.Ed.2d 386 (1962), "each of the episodes gained color from each of the others." *See also, United States v. Stanchich,* 550 F.2d 1294, 1300 (2d Cir.1977). The government's proof need not "exclude every reasonable hypothesis, other than that of guilt" to support a conviction. *Holland v. United States,* 348 U.S. 121, 139–140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954); *United States v. Taylor,* 464 F.2d 240, 244 (2d Cir.1972); *see also, United States v. Lubrano,* 529 F.2d 633, 636 (2d Cir.1975), *cert. denied,* 429 U.S. 818, 97 S.Ct. 61, 50 L.Ed.2d 78 (1976).

Thomas also contends that the government has failed to prove that he had knowledge of the overall conspiracy in which he participated. However, Thomas' membership was evidenced by continuing street-corner sales along with isolated instances in which he attempted to further or protect the business. Therefore, "[t]he jury could properly infer that [Thomas] had knowledge of others above him in the chain of distribution and that he was dependent on their activities...." *United States v. Barnes, supra,* 604 F.2d at 159. *See also, United States v. Taylor, supra,* 562 F.2d at 1352–53, 1354; *United States v. Tramunti, supra,* 513 F.2d at 1110, 1112. Thus, the "single act" doctrine upon which Thomas relies, *see United States v. Torres,* 503 F.2d 1120, 1123–24 (2d Cir.1974) and cases cited therein, is inapposite here. Moreover, there is evidence that Thomas was aware of drug transactions in which he did not participate directly—those involving his brother Howard and the agents. In short, "it could reasonably be inferred that [Thomas] participated in the alleged enterprise with a consciousness of its general nature and extent." *United States v. Alessi, supra,* 638 F.2d at 473. Again, it is not the government's burden to prove that Thomas knew all the conspirators or each of their activities.

■ Even if a variance existed between the conspiracy charged and the conspiracies proved at trial, we would reverse as to an appellant only upon a showing that he had suffered substantial prejudice. *Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1247–48, 90 L.Ed. 1557, 1566–67 (1946); *Berger v. United States,* 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314, 1318 (1935). There is no such showing here. There was no charge here based on *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), which allows one member of a conspiracy to be convicted for substantive crimes if committed by another in furtherance of the conspiracy. We have found no hearsay statements uttered by a member of one of the conspiracies that was used to the detriment of a member of an-

other. *United States v. Miley,* 513 F.2d 1191, 1208 (2d Cir.), *cert. denied sub nom. Vavrigos v. United States,* 423 U.S. 842, 96 S.Ct. 75, 46 L.Ed.2d 62 (1975). There was also no prejudicial "spillover effect." Evidence that each appellant conspired to distribute heroin was substantial. Moreover, although nineteen defendants were indicted, only four went to trial, and there were at most two conspiracies. Thus, the number of persons tried together was small enough to enable the jury to give individual consideration to each. *See, United States v. Alessi, supra,* 638 F.2d at 475 (ten defendants, conviction affirmed); *United States v. Ricco,* 549 F.2d 264, 271 (2d Cir.), *cert. denied sub nom. Indiviglia v. United States,* 431 U.S. 905, 97 S.Ct. 1697, 52 L.Ed.2d 389 (1977) (twelve indicted, three unindicted co-conspirators, five went to jury, two conspiracies, conviction affirmed).[17]

That the defendants were accorded such consideration appears from the verdicts: Carson was acquitted on one of the two substantive counts against her, and the jury acquitted Gayburnetta Galloway on the conspiracy count and was unable to reach a verdict on the substantive count against her. *United States v. Alessi, supra,* 638 F.2d at 475; *United States v. Toliver,* 541 F.2d 958, 963 (2d Cir.1976). Finally, no "shocking or inflammatory" evidence was introduced against any of the defendants. *See, United States v. Alessi, supra,* 638 F.2d at 475; *cf. United States v. Bertolotti,* 529 F.2d 149, 158 (2d Cir.1975). Rather, "the crimes of the various appellants were not markedly different," *United States v. Miley, supra,* 513 F.2d at 1209, and the evidence introduced at trial against all defendants consisted mainly of real and testimonial evidence pertaining to drug transactions. *See, United States v. Ricco, supra,* 549 F.2d at 271.

**B. Claims of Mont.**

Mont argues that the court below erroneously admitted a hearsay statement implicating him in the distribution of heroin. Finding this claim without merit, we affirm Mont's conviction on all counts.

■ During his testimony, Agent Baker recounted a conversation he had in Atlanta with an individual named "Sam." Baker met Sam at Guy Wilkins' suggestion and used the occasion to identify sources of heroin. Sam indicated that he did not deal in heroin but made two telephone calls in an unsuccessful attempt to locate a source. Sam then asked, "Why don't you go to Lam?"[18] Baker inquired, "Who is Lam? Is he the owner of the *Our Place Bar?*" Sam replied, "Yes, he is probably doing the largest amount of heroin in Manhattan." Sam said he would go to New York and, if Baker had difficulty meeting Lam, he, Sam, would introduce them. Mont contends that these statements were inadmissible because Sam's membership in the conspiracy was not independently established and because the statements were not within any exception to the rule against hearsay. *See,* Fed.R. Evid. 801(d)(2)(E); *United States v. Geaney, supra,* 417 F.2d at 1120. The government responds that Mont failed to preserve this issue for appellate review and argues further that Sam's statements were admissible as statements of a co-conspirator, as verbal acts, and as an aid to the jury's understanding of background events leading to the agents' investigation of Mont. Finally, the government argues harmless error. We conclude that if it were error to admit these statements, it was harmless because (1) the jury already had twice heard the substance of Sam's remarks, and (2) there was substantial additional evidence of Mont's guilt.

There was earlier evidence that when Agent Baker purchased heroin from Guy

17. *Cf. Kotteakos v. United States,* 328 U.S. 750, 753, 66 S.Ct. 1239, 1242, 90 L.Ed.2d 1557, 1560 (1946) (thirty-two indicted, nineteen tried together, thirteen went to jury, conviction reversed); *United States v. Bertolotti,* 529 F.2d 149, 156 (2d Cir.1975) (twenty-nine indicted, thirty-one unindicted co-conspirators, seventeen went to jury, at least four conspiracies, conviction reversed).

18. "Lam," of course, is a nickname for Mont, whose initials are "L.A.M." *See* note 6 *supra.*

Wilkins on July 18, 1980, Wilkins indicated that his source was the owner of the *Our Place Bar*[19] and that the owner would soon receive part of a two-hundred pound shipment of heroin.

Similarly, there was earlier testimony that on September 9, 1980, when Agents Baker and Coleman gave Guy Wilkins an ounce of quinine and Baker announced he wanted to trade quinine towards the cost of heroin, especially with "the *Our Place Bar* source of supply," Wilkins replied "that's possible," because that source was one of the largest dealers of heroin in Manhattan and would probably need the quinine. Baker asked whether that source had received part of the two-hundred pound shipment of heroin, and Wilkins answered that it had not.

In short, Sam's statements merely corroborated what Wilkins, a member of the conspiracy well acquainted with Mont, had already said. Since the statements of Wilkins were admitted as statements of a co-conspirator in furtherance of the conspiracy, it is unlikely that those of Sam were significant factors in the jury's decision. Our conclusion that the error, if any, was harmless is reinforced by the fact that the evidence of Mont's guilt is compelling, as noted above.[20]

## C. *Claims of Carson.*

In addition to challenging the sufficiency of the evidence supporting her conviction on the conspiracy count, Carson argues that there is insufficient evidence to sustain her conviction on a substantive charge. She also claims error in the trial court's charge respecting the effect that a finding of guilt on a substantive count should have on the jury's consideration of the conspiracy count. Finding no merit in these claims, we affirm Carson's convictions.

### 1. *The Substantive Count.*

Carson contends that there is insufficient evidence to support her conviction on Count 15, which charged her with possession with intent to distribute, and with distribution of, heroin in a July 25, 1981 sale to Agents Baker, Johnson and Williams. The question for us is whether there was evidence from which the jury could have found, beyond a reasonable doubt, that Carson knowingly participated in the sale. We conclude that the evidence was sufficient and affirm her conviction on Count 15.

On July 21, Wilkins had agreed to act as an intermediary in a heroin sale between the agents and Fred Galloway. There was no mention of Carson, but four days later, on July 25, when Wilkins arrived at the *Flash Inn* to meet the agents as planned, he was accompanied by Carson, whom he introduced as his "partner." Acknowledging the relationship, Carson confirmed the details of the partnership with Wilkins and discussed the heroin business. The partners—Carson and Wilkins—then drove with Agent Williams to the *Close Encounters Discotheque.* En route, Carson engaged in a narcotics-related conversation from which there can be no doubt that she was fully aware that the agents' purpose in going to the discotheque was to buy heroin from Galloway and Wilkins. When they arrived at the discotheque, arrangements were made for Gayburnetta Galloway to go some place, pick up the heroin and return with it. During Gayburnetta's absence, a fight broke out among patrons. Fearful that the police would arrive, Carson remarked to Agent Johnson that Galloway, whom she had greeted earlier, was stupid for allowing a fight to go on when he was "taking care of business."

Fully aware that delivery of the heroin was imminent and that the police were like-

---

**19.** Guy Wilkins repeated this statement in an August 12, 1981 conversation with Agent Baker.

**20.** Mont challenges the admission of statements implicating him in the conspiracy on the ground that they constitute inadmissible hearsay. However, there is sufficient evidence ty-

ing all appellants to the conspiracy to render such statements admissible as declarations of a co-conspirator in furtherance of the conspiracy. *See* Fed.R.Evid. 801(d)(2)(E) and *United States v. Geaney,* 417 F.2d 1116 (2d Cir.1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970).

ly to arrive on the scene momentarily to deal with the fight, Carson went outside with the agents and was later joined by Wilkins. When Gayburnetta arrived, Wilkins said, "the dope's here. Let's go inside," and the group, including Carson, reentered the discotheque. Gayburnetta brought the heroin to an office in the discotheque. After conversing with Galloway and receiving $42,000 cash from the agents, Wilkins retrieved a paper bag from the office and handed it to Agent Baker.

Agent Baker gave the bag to Agent Johnson, who left to perform a field test on its contents. The test indicated heroin, and Johnson returned to the discotheque. Having earlier assured the agents that she could supply heroin if they wanted it, Carson gave Agent Johnson her telephone number upon his request. She then warned Agent Johnson that police were in the discotheque, and the agents left.

The jury could reasonably conclude from this evidence that Carson knowingly participated in the July 25 heroin transaction and assisted in its successful completion. In particular, her fear of police intervention, her warnings to Agent Johnson, and her participation in the outside watch for Gayburnetta, permit the inference that Carson acted as a lookout. As Wilkins' "partner," she had a clear interest in the success of the transaction. The jury was warranted in finding that her appearance with Wilkins at the *Flash Inn* on the morning of July 25 was not as an innocent companion but as a sophisticated partner in the planned sale. *Cf. United States v. Calabro, supra,* 449 F.2d at 890. Her presence enabled her to observe and size up the customers and assure them that they were dealing with an established and reliable source of supply with a view to promoting and successfully completing the pending, as well as future, heroin deals.[21] This conclusion is supported

by Carson's later refusal to deal with the agents because they "asked too many questions" on the night of the sale. This evidence, considered in light of the circumstances, permitted the jury to conclude, beyond a reasonable doubt, that Carson knowingly assisted in the sale, participated in it as something she wished to bring about, had a stake in its success, and sought by her actions to make it succeed. It was therefore reasonable for the jury to conclude that she was an aider and abettor in the sale. 18 U.S.C. § 2; *United States v. Barton,* 647 F.2d 224, 239 n. 12 (2d Cir.), *cert. denied,* 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981); *United States v. Clemente,* 640 F.2d 1069, 1078–79 (2d Cir.), *cert. denied,* 454 U.S. 820, 102 S.Ct. 102, 70 L.Ed.2d 91 (1981); *United States v. Bommarito,* 524 F.2d 140, 145 (2d Cir.1975); *United States v. Pui KanLam,* 483 F.2d 1202, 1207–08 (2d Cir.1973), *cert. denied,* 415 U.S. 984, 94 S.Ct. 1578, 39 L.Ed.2d 881 (1974).

### 2. The Jury Charge.

During its deliberations, the jury sent a note to the court, stating: "The jury requests to know whether a decision of guilt on a substantive count automatically denotes guilt on the count of conspiracy." Answering the note, Judge Brieant instructed: "The answer to your question, in two words, is 'absolutely not.'" Carson argues that "[a]lthough the trial judge charged the jury that conviction on Count I should not be 'automatic' if they found Carson had committed the acts charged against her in Count XV, as a practical matter, the jury's verdict finding Carson guilty on Count XV virtually automatically had to result in a guilty verdict as to Count I as well." (Br. at 23.) This argument is frivolous.

---

**21.** In a July 17, 1981 conversation with the agents, Wilkins indicated that, since Chaffin was out of favor with "the Italians," he, Wilkins, could offer two potential sources of supply: Galloway, Chaffin's former partner, or Carson. Baker stated that he preferred to deal with Galloway. Baker also asked whether Gal-

loway's heroin would be of the same quality as Chaffin's. Wilkins replied that the heroin would come from the same source, "the Italians." Thus, the inference is reasonable that Carson was attempting to change the agents' preference for Galloway as a source of supply.

Although Judge Brieant did charge that a finding of guilt on a substantive charge could be considered by the jury in evaluating the conspiracy count, he repeatedly stressed that the elements of the crime were different, that each count had to be considered separately, and that each element of the crime had to be proven beyond a reasonable doubt before a verdict of guilt could be rendered on any count. Moreover, the court instructed the jury to decide each count of the indictment separately as to each defendant who was named in the count.

In view of the foregoing, Carson's conviction on the conspiracy count is also affirmed.

## D. *Claims of Kenneth Thomas.*

Challenging his conviction on the conspiracy count, Thomas raises four issues on appeal in addition to his claim that the evidence was insufficient. He argues that the district court erred in denying his motion for a severance, in refusing to instruct the jury that the charge on aiding and abetting was not applicable to the conspiracy count, and in erroneously admitting into evidence contraband found in his possession at the time of his arrest, along with the agents' testimony that Thomas had engaged on numerous occasions in what appeared to be drug transactions. We find these claims to be without merit and affirm Thomas' conviction on the conspiracy count.

### 1. *Severance.*

Thomas' claim that the district court erred in denying his motion for a severance is based on two arguments. First, he asserts that the disproportionate charges and proof against him, as compared to his co-defendants, caused substantial prejudice. Second, he contends that the jury convicted him on the basis of guilt by association because there was substantial proof that

the heroin conspiracy was a family business in which his brother, Howard Thomas, was culpably involved.[22] Thus, in essence, Thomas argues that he was unfairly prejudiced by the introduction of evidence concerning his co-defendants, which spilled over into the jury's consideration of the case against him. We disagree.

In *United States v. Losada, supra,* we recently noted the "heavy burden of persuasion" that an appellant bears in urging reversal of a trial court's decision not to grant a severance. 674 F.2d at 171. "[T]he decision to grant or deny a severance pursuant to Rule 14 is within the broad discretion of the trial court and will not be overturned on appeal absent some showing that the defendant suffered substantial prejudice due to the joint trial." *Id.* (quoting *United States v. Weisman,* 624 F.2d 1118, 1129–30 (2d Cir.), *cert. denied,* 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980)). That the defendant would have had a better chance of acquittal at a separate trial does not constitute substantial prejudice. *United States v. Sotomayor,* 592 F.2d 1219, 1228 (2d Cir.), *cert. denied sub nom. Crespo v. United States,* 442 U.S. 919, 99 S.Ct. 2842, 61 L.Ed.2d 286 (1979); *United States v. Stirling,* 571 F.2d 708, 733 (2d Cir.), *cert. denied,* 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978). Moreover, in determining whether a trial court's decision was correct, "a reviewing court should consider the need for judicial economy and the extent to which the judge instructed the jury to consider the evidence separately with respect to each defendant." *United States v. Losada, supra,* 674 F.2d at 171.

There is no question that Thomas played a less prominent role in the conspiracy than many of his co-defendants. However, differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient

---

**22.** In addition to the fact that numerous defendants were related, there was other evidence indicating that the conspiracy was a "family business." Thus, during a heroin sale to the agents on June 24, 1980, Anthony Pegues referred to the heroin business in which he and

Guy Wilkins were involved as a "family thing." Similarly, on August 10, 1981, Kenneth Nunes quoted Agent Johnson a favorable price of $8,500 for heroin because their business was "family."

grounds for separate trials. *United States v. Aloi,* 511 F.2d 585, 598 (2d Cir.), *cert. denied,* 423 U.S. 1015, 96 S.Ct. 447, 46 L.Ed.2d 386 (1975). Moreover, the fact that evidence may be admissible against one defendant but not another does not necessarily require a severance. *United States v. Losada, supra,* 674 F.2d at 171; *United States v. Lyles,* 593 F.2d 182, 190 (2d Cir.), *cert. denied,* 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979); *United States v. Aloi, supra,* 511 F.2d at 598. Here, the trial court instructed the jury on numerous occasions to accord each defendant separate consideration. *United States v. Losada, supra,* 674 F.2d at 171–72; *United States v. Weisman, supra,* 624 F.2d at 1130. The evidence against Thomas was simple enough for the jury to consider without significant spillover effect. *United States v. Losada, supra,* 674 F.2d at 171; *United States v. Barton, supra,* 647 F.2d at 241; *United States v. Weisman, supra,* 624 F.2d at 1130. That the jury did so appears from the verdicts, as noted above. *United States v. Weisman, supra,* 624 F.2d at 1130; *United States v. Barnes, supra,* 604 F.2d at 161. Thus, the disparity in the proof and charges did not unfairly prejudice Thomas.

Nor does it appear that the jury was unable to distinguish among family members in finding guilt or innocence. Gayburnetta Galloway was acquitted even though her father, who pled guilty prior to trial, testified to his criminal involvement. In any event, proof of Howard Thomas' heroin-related activities would have been admissible against Thomas in a separate trial to establish the existence of the conspiracy. *See, United States v. Praetorius,* 622 F.2d 1054, 1063 (2d Cir. 1979), *cert. denied sub nom. Lebel v. United States,* 449 U.S. 860, 101 S.Ct. 162, 66 L.Ed.2d 76 (1980). Consequently, the joint trial did not result in substantial prejudice to Thomas.

*2. The Court's Instructions on Aiding and Abetting.*

The trial judge charged that anyone who "aids, abets, counsels, commands, induces or procures" the commission of a federal offense is punishable as a principal. This instruction was repeated in response to a note from the jury asking for clarification of the meaning of "intent" as stated in the indictment. Thomas argues that this charge on aiding and abetting was unfairly prejudicial because it permitted the jury to convict him as an aider and abettor while finding insufficient evidence of his knowing membership in the conspiracy. This claim is also without merit.

In its main charge, the court had consistently discussed the conspiracy and substantive counts separately, and clearly specified and defined each of the elements of the conspiracy charge, including knowing participation. Before defining "aiding and abetting," the court instructed at the outset that the concept could be considered in connection with the counts then under discussion, *i.e.,* the substantive counts. Previously, the court had cautioned that Thomas was charged only with conspiracy and not with any substantive crimes. The court construed the jury's note as a request for clarification of the meaning of "intent" as relating to the phrase "possession with intent to distribute," and concluded its response to the note as follows:

A person possesses with intent to distribute if she aids or abets some other person in selling or possessing with intent to distribute or distributing heroin, and does so knowingly and wilfully.

I instruct you that you may find intent from considering all of the evidence in the case. However, specific criminal intent must be proved beyond a reasonable doubt *before a person may be convicted of any of these substantive crimes* in this indictment with respect to possession or intent to distribute. (Emphasis added.)

Counsel for Thomas did not object to this charge. Nor did he request that the court distinguish between substantive crimes and the conspiracy charge at this point.

Objection came to the court's response to a later note from the jury requesting assistance regarding the liability of a defendant for acts committed by a co-conspirator. The court responded by instructing that:

*In deciding the substantive count* you decide whether the person whose case you are then considering in the substantive count knowingly and wilfully either committed all the elements or knowingly and wilfully aided and abetted someone else to do the crime. An aider and abettor is accountable for the criminal acts of the principal. That I did tell you. But a member of the conspiracy is not on the theory of this case accountable for a substantive crime committed by a member of the conspiracy, by another member, in furtherance of it. (Emphasis added.)

Counsel for Thomas then requested the court to instruct that the charge on aiding and abetting was not applicable to the conspiracy count, and the court refused.

The court's charges on aiding and abetting, whether viewed separately or, as they should be in the context of the entire charge, *United States v. Scacchetti,* 668 F.2d 643, 649 (2d Cir.1982), were correct. In short, there is little likelihood that the jury was misled into believing that one who was not shown to be a knowing member of the conspiracy could be convicted as a member on a theory of aiding and abetting. The jury's lack of confusion is evidenced by its acquittal of Galloway on the conspiracy count while failing to reach a verdict on the substantive count. *See, United States v. Sanzo,* 673 F.2d 64, 69 (2d Cir.1982).

### 3. *Admissibility of the Seized Contraband.*

When Thomas was searched incident to his arrest, two vials containing traces of heroin and cocaine and several cellophane envelopes were found in his possession, and these items were received in evidence at trial.[23] Thomas argues that the admission of the contraband was so prejudicial that it should have been excluded because it was proof of similar uncharged crimes and that the period of one week between the filing of the indictment (October 13, 1981) and his arrest (October 20, 1981) was too lengthy to

permit an inference of his participation in the conspiracy.

 As we have often observed, the trial judge has broad discretion in ruling on the admissibility of relevant evidence: "the preferable rule is to uphold the trial judge's exercise of discretion unless he acts arbitrarily or irrationally." *United States v. Robinson,* 560 F.2d 507, 515 (2d Cir.1977) (en banc), *cert. denied,* 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978). There has been no showing that the trial judge was either arbitrary or irrational in balancing the probative value of this evidence against its prejudicial effect. Quite the contrary. Even if we assume that the contraband proved similar uncharged crimes, glassine envelopes and vials containing narcotics are tools of the drug trade, and evidence of possession of them at a closely related time is relevant to the conspiracy charge and not a mere showing of bad character, even if they relate to transactions outside the scope of the conspiracy. *See, e.g., United States v. Barnes, supra,* 604 F.2d at 166–67; *United States v. Viserto,* 596 F.2d 531, 537–38 (2d Cir.), *cert. denied,* 444 U.S. 841, 100 S.Ct. 80, 62 L.Ed.2d 52 (1979).

Standing alone, the one-week lapse of time between the filing of the indictment and seizure of the contraband was not so lengthy as to render the evidence too remote from the crime to preclude an inference that Thomas participated in the conspiracy, even if Thomas' source, his brother Howard, was arrested on October 4, 1981, sixteen days before the seizure. *See, United States v. Taylor, supra,* 562 F.2d at 1358; *United States v. Bermudez,* 526 F.2d 89, 95–96 (2d Cir.1975), *cert. denied,* 425 U.S. 970, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976); *United States v. Tramunti, supra,* 513 F.2d at 1115–16; *United States v. Mallah,* 503 F.2d 971, 981 (2d Cir.1974), *cert. denied,* 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975).

---

**23.** After Judge Brieant ruled that the heroin was admissible, counsel for Thomas insisted that the cocaine be admitted as well.

4. *Testimony Regarding Street-Corner Transactions.*

 Thomas argues that the district court erred in allowing Agents Johnson and West to testify concerning their observations of Thomas engaging in what appeared to them to be narcotics transactions. First, he claims that the testimony did not relate sufficiently to the conspiracy charged and, thus, constituted inadmissible proof of other crimes under Fed.R.Evid. 404(b). In addition, Thomas contends that the agents should not have been permitted to testify as to their opinions regarding the nature of Thomas' activities. We find no error in the trial judge's ruling on these evidentiary points.

Johnson and West made their observations during the course of their undercover activities. Each agent testified that he observed Thomas covertly passing something to people on the street in exchange for cash. During Johnson's testimony, counsel for Thomas objected to Johnson's conclusion that these exchanges appeared to him to be drug transactions. Counsel did not object or contend that Johnson's description constituted proof of other crimes. Nor did he move to strike it on that basis. Moreover, counsel did not object at all to West's testimony concerning his observations and conclusions.

Having failed to object to this testimony on the ground now urged, Thomas waived an objection that the testimony constituted inadmissible evidence of other crimes. *See, United States v. Hutcher,* 622 F.2d 1083, 1087 (2d Cir.), *cert. denied,* 449 U.S. 875, 101 S.Ct. 218, 66 L.Ed.2d 96 (1980). Moreover, as we have said earlier, evidence of Thomas' apparent drug-related activities was relevant to the conspiracy charge, even if it proved other crimes. *See, United States v. Barnes, supra,* 604 F.2d at 166; *United States v. Viserto, supra,* 596 F.2d at 536, 537–38. Thus, the trial court did not abuse its discretion in failing to strike the testimony. The admissibility of this evidence was not dependent on direct proof that the

drugs sold by Thomas were of conspiracy origin. As we noted in *Viserto, supra,* "[n]arcotics is a business, though an illegitimate one, and evidence that the defendants were in the business at a closely related time is relevant, and is not a mere showing of bad character." 596 F.2d at 537–38. Thomas also contends that the furtive exchanges may have related to other illicit activity, but this effects the weight of the proof and not its admissibility.

Nor was it error for the court to permit the agents to testify that Thomas' furtive activity appeared to them to be sales of narcotics. Under Fed.R.Evid. 702, expert testimony is admissible if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." The subject of the expert testimony here, *i.e.,* the clandestine manner in which drugs are bought and sold, is unlikely to be within the knowledge of the average layman. *United States v. Johnson,* 575 F.2d 1347, 1361 (5th Cir. 1978), *cert. denied,* 440 U.S. 907, 99 S.Ct. 1214, 59 L.Ed.2d 454 (1979). The conclusions of the agents were based on years of experience investigating narcotics offenses.[24] This provided them with specialized knowledge, not possessed by the jury, of the manner in which drug transactions are conducted. Thus, under Rule 702, it was proper for the agents to recount their observations and render an opinion based on them. *See, e.g., United States v. Borrone-Iglar,* 468 F.2d 419, 421 (2d Cir.1972), *cert. denied sub nom. Gernie v. United States,* 410 U.S. 927, 93 S.Ct. 1360, 35 L.Ed.2d 588 (1973) (expert opinion of DEA agent that coded conversations involved narcotics transaction admissible); *see also, United States v. Martino,* 664 F.2d 860, 864 n. 3 (2d Cir.1981); *United States v. Cirillo,* 499 F.2d 872, 881 (2d Cir.), *cert. denied,* 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974). "[T]he trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous." 3 J. Weinstein & M. Berger, Weinstein's Evi-

---

**24.** Agents Johnson and West together served for twenty years as officers of the narcotics branch of the Washington, D.C. police department.

**370**

dence ¶¶ 702[02]; *McGregor-Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1138 n. 7 (2d Cir.1979); *Fernandez v. Chios Shipping Co.,* 542 F.2d 145, 153 (2d Cir.1976). Again, there is no indication that the trial court's ruling constituted an abuse of discretion.

## CONCLUSION

Finding the judgments of conviction entered below to be supported by substantial evidence, and finding no reversible error, we affirm the convictions of all appellants on all counts.