08-5968, -6092
USA v. O'Connor

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2010

(Argued: October 13, 2010          Decided: June 16, 2011)

Docket Nos. 08-5968-cr, -6092-cr

_____

UNITED STATES OF AMERICA,

Appellee,

- v. -

LINDA O'CONNOR, DEAN SACCO,

Defendants-Appellants.
_____

Before: KEARSE, POOLER, and HALL, Circuit Judges.

Appeal from a judgment of the United States District Court for the Northern District of New York, Thomas J. McAvoy, Judge, convicting defendants of sex trafficking of a child, see 18 U.S.C. §§ 1591(a) and (b); convicting defendant O'Connor of selling a child for the purpose of producing child pornography, see id. § 2251A(a), and producing child pornography, see id. § 2251(b); and convicting defendant Sacco of buying a child for the purpose of producing child pornography, see id. § 2251A(b), producing and possessing child pornography, see id. §§ 2251(a), 2252A(a)(5)(B) and 2256, and interstate travel with intent to engage in illicit sexual conduct with a minor, see id. § 2423(b).

Affirmed.

SCOTT MEISLER, Criminal Division, United States Department of Justice, Washington, D.C. (Richard S. Hartunian, United States Attorney for the Northern District of New York, Miroslav Lovric, Brenda K. Sannes, Assistant United States Attorneys, Syracuse, New York, Lanny A. Breuer, Assistant Attorney General, Greg D. Andres, Acting Deputy Assistant Attorney General, Richard M. Re, Appellate Section, Criminal Division, United States Department of Justice, Washington, D.C., on the brief), _for Appellee_.

LISA A. PEEBLES, First Assistant Federal Public Defender, Syracuse, New York (Alexander Bunin, Federal Public Defender, James P. Egan, Syracuse, New York, on the brief), _for Defendant-Appellant O'Connor_.

BRENDAN WHITE, New York, New York (White & White, New York, New York, on the brief), _for Defendant-Appellant Sacco_.

KEARSE, _Circuit Judge_:

Defendants Linda O'Connor and Dean Sacco appeal from final judgments entered in the United States District Court for the Northern District of New York following a jury trial before Thomas J. McAvoy, _Judge_, convicting them of sex trafficking of a child, in violation of 18 U.S.C. § 1591; convicting O'Connor of selling a child for the purpose of producing child pornography, in violation of 18 U.S.C. § 2251A(a), and permitting her child to be used for the production of child pornography, in violation of 18 U.S.C. § 2251(b); and convicting Sacco of buying a child for the purpose

- 2 -

of producing child pornography, in violation of 18 U.S.C. § 2251A(b), coercing a child to engage in sexually explicit conduct for the production of child pornography, in violation of 18 U.S.C. § 2251(a), travel in interstate commerce with intent to engage in illicit sexual conduct with a minor, in violation of 18 U.S.C. § 2423(b), and possession of child pornography, in violation of § 2252A(a)(5)(B). O'Connor was sentenced principally to 30 years' imprisonment. Sacco was sentenced principally to imprisonment for life.

On appeal, O'Connor contends, inter alia, that the evidence was insufficient to support her conviction on any count and that the district court deprived her of a fair trial by denying her motions for severance of her trial from that of Sacco. She also challenges certain evidentiary rulings. Sacco contends chiefly that the district court deprived him of a fair trial by denying his attorney's request to withdraw from the case, by admitting in evidence portions of his self-titled autobiography that give an account of his past thoughts and conduct, and by denying his request for a continuance following unexpected testimony from a government witness. Finding no merit in any of defendants' contentions, we affirm the judgments of conviction.

I. BACKGROUND

The present prosecution focused on the sexual abuse of O'Connor's daughter--identified in the briefs before us as

"S.O."--from 2004 into February 2007. The government's evidence at trial, conducted in May 2008, was presented principally through the testimony of S.O. and numerous other witnesses including social workers, law enforcement agents, and former friends or acquaintances of S.O., O'Connor, or Sacco. Viewed in the light most favorable to the government, the evidence reveals the following.

## A. Evidence as to the Abuse of S.O.

S.O. testified that she was sexually abused by her mother, by her mother's sex partner, George Lang (or "George" or "Lang"), by Sacco, and by two strangers in encounters arranged by her mother.

### 1. Abuse by O'Connor and George Lang in 2004-2005

O'Connor began abusing S.O. in the bathroom of their home in Deposit, New York, in 2004, when S.O. was 10 years of age. In the guise of helping S.O. wash and dry herself, O'Connor started touching S.O. inappropriately, such as by rubbing her vagina. (See Trial Transcript ("Tr.") 1458-59.) S.O., who by then had been bathing herself for two years, asked her mother to stop; but the abuse escalated; approximately twice a month, O'Connor would lead S.O., naked, from the bathroom to O'Connor's bedroom, where O'Connor, naked, would kiss and touch S.O.'s genitalia and require S.O. to reciprocate. (See id. at 1459-61.) S.O. testified that pleading with her mother to stop was "useless"

- 4 -

(id. at 1461) because O'Connor's response was "that she was my mother and I was supposed to do what she said" (id. at 1460). Thus, S.O. ceased to protest. (See id. at 1461.)

In 2004, O'Connor and S.O. were spending substantial amounts of time with George and Renee Lang, a married couple whom S.O. sometimes called "Grandpa" and "Grandma" (id. at 1306). During this period, O'Connor was sometimes late in paying the rent and was threatened with eviction (see id. at 1500-01); Lang would sometimes help O'Connor with the rent (see id. at 1457, 1501).

O'Connor and George Lang communicated frequently online (see id. at 1465), often sending each other pornographic images (see id. at 1237). In 2004, O'Connor and S.O. spent many weekends at the Langs' home in nearby Nineveh, New York; O'Connor and Lang were sex partners, engaging in sexual activities in the Langs' living room after Renee Lang (or "Renee") had gone to sleep and could be heard snoring in the Langs' bedroom. After S.O. walked in on O'Connor and George one night and saw them having intercourse, O'Connor required S.O. to participate in sexual activities with them: George kissed and touched S.O.; O'Connor kissed and touched George; O'Connor kissed and touched S.O. (Tr. 1476-79.)

In the ensuing months, George Lang continued to abuse S.O., sometimes with O'Connor and sometimes individually. George and O'Connor would ply S.O. with liquor before molesting her. One adult would sometimes take photographs of S.O. as she

- 5 -

performed sex acts on the other, and George would later show S.O. the photos on his computer. George engaged in oral and manual sex with S.O. but not intercourse. (See id. at 1481-88.)

In late 2004, George Lang was diagnosed with cancer, and his abuse of S.O., although continuing, became less frequent (see id. at 1496). O'Connor and S.O. stopped going to the Langs' home in early 2006 after arguments between O'Connor and Renee or George. (See id. at 1263-65, 1497-98.) In July 2006, Lang succumbed to his cancer. (See id. at 1320.)

2. Abuse by O'Connor and Sacco in 2006-2007

In June 2006, a flood forced O'Connor and S.O. out of their home in Deposit, and at the beginning of August they moved into the downstairs apartment of a house at 45 Fair Street in Norwich, New York ("45 Fair"), where their new landlord was Sacco. (See Tr. 1453, 1470, 1502-04.) On the day they moved in, Sacco told them he lived in New Jersey but that since he had to be back in Norwich the next day, he planned to spend the night in his car; O'Connor invited him to sleep in the apartment instead. (See id. at 1507, 1622-23.) During the night, S.O. woke up to find Sacco kissing her; he had removed her clothing and soon was having intercourse with her. Sacco told S.O. to be quiet, and S.O., terrified, obeyed. Sacco eventually stopped, dressed, and left the room, leaving S.O. crying into her pillow. S.O. did not tell O'Connor. (See id. at 1507-09.)

Little more than a week later, S.O. ingested and injected herself with some of her mother's medicines in an attempt to commit suicide. She was hospitalized, and the Chenango County Department of Social Services ("DSS") was notified. (See Tr. 804-05, 1510-11.) Later in August 2006, DSS learned that O'Connor herself had gone to the hospital seeking treatment for kidney stones and had left S.O. at home unsupervised. A DSS caseworker, finding S.O. home alone, with nothing in the kitchen except rotten food and frozen items that S.O. did not know how to prepare, determined that S.O. could not care for herself and arranged to have her transferred to the temporary custody of Renee Lang. (See id. at 815-18.) During the period in which she was living with Renee, S.O. told social workers that Sacco "trie[d] to hug her a lot" and that he "creep[ed] her out" and "scare[d] her." (Id. at 827; see id. at 1521.)

O'Connor, once out of the hospital, showered S.O. with gifts and promised that their relationship would improve; and both of them wanted to resume living together. (See id. at 821-22, 1516-20.) In October, the Family Court held a hearing at which DSS recommended that S.O. instead be placed in foster care. The court rejected that recommendation and returned S.O. to O'Connor's custody. However, in light of DSS's report of S.O.'s prior statements about Sacco's repeated "creep[y]" hugging, the court ordered O'Connor not to allow S.O. to have unsupervised contact with Sacco. (Id. at 826-27.)

O'Connor ignored that condition, and a few weeks later, Sacco sexually abused S.O. again. In late October, the upstairs apartment at 45 Fair had become vacant. Sacco soon arrived at 45 Fair and spoke with O'Connor at the door. After a conversation that S.O. could not hear, O'Connor came in and got S.O., and Sacco instructed S.O. to join him upstairs. (See id. at 1522-23, 1527.)

Upstairs, Sacco had intercourse with S.O. He then used a camera with a zoom lens to take pornographic photographs of her. (See id. at 1523-25.) When she initially refused to pose as instructed, Sacco hit her. (See id. at 1525.) When Sacco finally allowed S.O. to leave, she ran downstairs to her mother, who was in the kitchen. Crying, S.O. told O'Connor, "[M]om, Dean is doing stuff that's hurting me." (Id. at 1526.) O'Connor responded, "[I]t's better than being homeless," and left the room. (Id.)

The next time Sacco abused S.O., on Thanksgiving in 2006, he was joined by O'Connor. After serving S.O. alcohol at dinner (see Tr. 1531), Sacco and O'Connor took S.O. into her bedroom, where, first, Sacco had intercourse with S.O. Then Sacco had intercourse with O'Connor. S.O. was then ordered to perform oral sex on Sacco and to kiss her mother. (See id. at 1528.) Sacco had again brought a camera, which appeared to S.O. to be the same one he had used to take pornographic pictures of S.O. previously; and he and O'Connor took turns taking pictures of each other as they abused S.O. (See id. at 1529.) At one point, after O'Connor

- 8 -

and Sacco had ignored S.O.'s pleas to stop, S.O. threatened to tell someone about the abuse. Sacco responded, "[I]f you tell[,] then I'll stab you and rape you as you die." (Id. at 1530.) S.O. believed him. (See id.)

Sacco had intercourse with S.O. twice in December 2006 in the upstairs apartment, including on S.O.'s thirteenth birthday (see Tr. 1540, 1546). On the first occasion, O'Connor remained downstairs after she had spoken with Sacco at the door and ordered S.O. to join Sacco upstairs. (See id. at 1541-42.) Sacco's abuse of S.O. on that occasion was interrupted by O'Connor's knock at the upstairs door to announce--through the door, without opening it--that the family of one of S.O.'s schoolmates had arrived to see S.O. (See id. at 1543.) On the second occasion, O'Connor joined Sacco and S.O. in the upstairs apartment and participated in the abuse of S.O. (See id. at 1547-48.)

Sacco last abused S.O. in February 2007. In the meantime, he and O'Connor had begun to have frequent arguments about money, with Sacco telling O'Connor that she owed him rent and needed to pay him soon. (See id. at 1555-56; see also id. at 2009-11 (testimony of a former Sacco employer (called as a witness by Sacco) that Sacco complained to him that the downstairs tenant at 45 Fair was not paying rent on time).)

There was no evidence that the government found any of the photographs that S.O. testified were taken, and no such photographs were presented at trial. However, the government presented evidence that, in a search of a locked storage unit

containing property belonging to Sacco, law enforcement agents had found a used condom. (See id. at 309-10, 327-28.) Forensic analysis revealed that the outside of the condom bore S.O.'s DNA. (See id. at 334-35, 1940-41.)

The government also introduced evidence of Sacco's prior sexual abuse of other young girls, calling as witnesses one of those victims, as well as a police detective who had investigated those events and to whom Sacco had admitted being attracted to girls in the age range of 8-11 years. (See Tr. 438-67, 677-78, 686.) And, as discussed in Part II.B.1. below, the government introduced published writings by Sacco in which he had described his pedophilic sexual appetites.

### 3. Abuse by Strangers, Arranged by O'Connor

In December 2006, O'Connor and S.O. rode a bus to Binghamton, New York, and checked into a Best Western hotel in nearby Johnson City. That night, a man S.O. had never seen arrived at their hotel room, and O'Connor told S.O. to "do what the man wants." The man proceeded to undress and to have intercourse and oral sex with S.O. O'Connor sat nearby, speaking only to remind S.O. to follow the man's orders. (See Tr. 1533-37.) S.O. testified that when they arrived in Binghamton O'Connor had "some money but not a lot," and that when the man left the hotel room O'Connor "had a lot more money." (Id. at 1539.)

In January 2007, O'Connor again took S.O. to the Best Western, where they went into a room in which a man S.O. had never seen was waiting. O'Connor told S.O. to follow the man's orders, and the man had intercourse with S.O. and forced her to perform oral sex. Meanwhile, O'Connor sat in the room eating donuts and watching television. (See id. at 1550-53.) S.O. went to the bathroom after the man had finished with her; when she emerged, the man was gone and there was money on the table. (See id. at 1554.)

B.  The Arrests of O'Connor and Sacco and the Proceedings Below

In late February 2007, O'Connor, after dining with S.O. at a Pizza Hut, was arrested when she attempted to leave without paying the bill. (See Tr. 892-93, 1628-29.) That arrest, along with O'Connor's violation of the Family Court's order not to allow S.O. to have unsupervised visits with Sacco, led to O'Connor's incarceration; at the urging of DSS caseworker Elizabeth Chesebro, O'Connor agreed to let S.O. be placed in foster care. (See id. at 896, 926.) Shortly thereafter, S.O. began to disclose the abuse she had suffered from Sacco--but did not disclose the abuse by her mother--telling a teacher, then Chesebro, and then Patrick Blenis, a Norwich police detective, that Sacco had raped her. (See id. at 1566-68.) On March 14 and 15, with Blenis, his supervisor, and Chesebro at her side, S.O. made controlled telephone calls to Sacco. (See id. at 138-42, 145-52.) Days later, Sacco was arrested on state-law charges, including rape.

(See id. at 152-53.) In the meantime, on March 18, as discussed in Part II.B.2. below, Sacco told his friend and landlord, Gerardo DiFiori, about a call he received from S.O., which Sacco had sensed was being monitored. Sacco said he was "in trouble" for doing "something wrong," and "if they get me, they're going to give me 30 years." (Id. at 527.) Pressed for details, Sacco said, "I had sex with a minor," "a prostitute"; "she's 12." (Id. at 528-29.)

In September 2007, fearing that S.O. was suicidal, Chesebro had her admitted to a psychiatric health center. (See Tr. 933-34.) During a conversation at that center the following month, S.O. disclosed to Chesebro that when she was abused by Sacco, O'Connor had acquiesced and had on one occasion taken photographs. (See id. at 937-46.) That disclosure prompted an investigation by state and federal officials, which ultimately led to the arrests of O'Connor and Sacco on federal charges. (See id. at 175-84, 192-94, 947.) In December 2007, S.O. disclosed O'Connor's incestuous conduct, as well as O'Connor's forcing her to have oral and manual sex with George Lang, and intercourse and oral sex with the strangers at the Best Western. (See id. at 959-61.)

In the seven-count indictment initiating the present prosecution, O'Connor and Sacco were charged with selling and buying, respectively, a child for the purpose of producing child pornography, in violation of 18 U.S.C. §§ 2251A(a) and (b), respectively, and 18 U.S.C. § 2 (Counts 1 and 2); and each was

- 12 -

charged with sex trafficking of a child, in violation of 18 U.S.C. §§ 1591(a) and (b) and 2 (Count 3), with coercing a minor to engage in sexually explicit conduct for the purpose of producing child pornography, in violation of 18 U.S.C. §§ 2251(a) and 2 (Count 4), and with possession of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and 2 (Count 7). In addition, O'Connor was charged, as the child's parent and custodian, with knowingly permitting her child to engage in sexually explicit conduct for the purpose of producing child pornography, in violation of 18 U.S.C. §§ 2251(b) and 2 (Count 5); and Sacco was charged with travel in interstate commerce for the purpose of engaging in illicit sexual conduct with a minor under the age of 18, in violation of 18 U.S.C. §§ 2423(b) and 2 (Count 6).

As discussed in Part II.D. below, O'Connor, prior to trial, moved for severance of her trial from that of Sacco, arguing principally that her defense and that of Sacco were irreconcilable and that the overwhelming evidence against Sacco would likely result in spillover prejudicial to O'Connor. The district court denied severance.

As discussed in Part II.A. below, two business days before the scheduled start of trial, Sacco's attorney, in a motion filed under seal, requested permission to withdraw as his counsel. The court denied that motion as well.

After an 18-day trial, the jury found O'Connor guilty on three of the five counts against her: Count 1 (selling a child for the purpose of producing child pornography), Count 3 (sex

trafficking of a child), and Count 5 (permitting her child to be used by Sacco in the production of child pornography). She was found not guilty on Count 4, which charged her with coercing S.O. to engage in sexual conduct for the purpose of producing child pornography, and Count 7, which charged her with possession of child pornography. Sacco was convicted on all five of the counts against him. O'Connor was sentenced principally to 30 years' imprisonment, to be followed by a life term of supervised release. Sacco was sentenced principally to prison for life.

II. DISCUSSION

On appeal, Sacco contends principally that the district court deprived him of a fair trial by denying his attorney's request to withdraw from the case, by admitting in evidence excerpts from his self-titled autobiography, and by refusing to grant a continuance after DiFiori's testimony as to Sacco's admission, which had been unanticipated. O'Connor contends principally that the evidence was insufficient to convict her on any count and that she was deprived of a fair trial by being tried jointly with Sacco. We find no merit in any of defendants' contentions.

A. Sacco's Attorney's Motion To Withdraw

Kelly E. Fischer Esq. had been appointed by the court to represent Sacco in this case in February 2008. On March 20, the

- 14 -

court scheduled the trial to begin on Monday, April 28, 2008. On Thursday April 24, Fischer asked the court to allow him to withdraw from the case. His motion, accompanied by his affirmation, was filed ex parte and under seal.

In a hearing in open court on April 25, Fischer directed the court's attention to the contents of his sealed affirmation and stated generally that the intensity of his personal feelings with regard to the case against Sacco might affect his ability to effectively represent his client. Citing an Ethical Consideration ("EC") set out in the New York Lawyer's Code of Professional Responsibility (the "Code"), reprinted in N.Y. Jud. Law App. (McKinney 2008), which was applicable at the time of Sacco's trial (but which has since been superseded by N.Y. Rules of Professional Conduct), Fischer stated as follows:

> Basically, your Honor, I would cite the ethical consideration under Professional Code of Professional Responsibility EC2-30 which basically says that if the intensity of an attorney's personal feelings might affect--may affect that attorney's ability to effectively represent his client, then the attorney should seek to withdraw. Based on the paperwork that I submitted which basically sets out my position personally, that raises a real concern for me in this case.

> THE COURT: All right.

> MR. FISCHER: Particularly with respect to the primary witness, almost the exclusive witness against Mr. Sacco, [S.O.].

(Transcript of Proceedings as to Dean Sacco, April 25, 2008 ("Sacco April 25 Tr."), at 3.)

Fischer's affirmation--which is hereby deemed unsealed to the extent that it is described in this opinion (and we leave it

to the district court to decide whether the motion should be unsealed in toto)--specified that in preparation for trial, Fischer had performed hours of research, had spoken with a variety of investigators and other sources, and had reviewed every page of the approximately 100 pounds of discovery materials that had been supplied by the government or obtained from other sources. However, Fischer stated that in the past two weeks he had received materials from the government that included the evidence as to Sacco's possession of the used condom bearing S.O.'s DNA. Fischer stated that until that time, he had been confident that he could vigorously defend Sacco's position at trial; but that "single bit of evidence" caused an immediate, involuntary, and substantial shift in his "moral and technical perspective on this case." Stating that his past successes in defending criminal cases were largely due to "the strength of my moral conviction[] and my ability to convey that moral conviction" to juries, Fischer stated that "while I could probably go through the motions to defend Mr. Sacco, my conviction would not be behind that representation." Fischer's affirmation did not cite any provision of the Code that imposed an Ethical Consideration or a Disciplinary Rule ("DR").

The government opposed Fischer's motion to withdraw. It noted that a substitution of counsel would substantially delay the start of trial. It stated that it had been "preparing [S.O.] to testify now for the last month, in addition to preparing all the other witnesses," and S.O. was "ready to walk into this Court and

testify about everything that happened to her." (Sacco April 25 Tr. at 6.)

O'Connor's attorney (who had stated in her severance motion that the defense positions of O'Connor and Sacco were irreconcilable) supported Fischer's motion to withdraw on the ground that it would hurt O'Connor's case "if [Fischer] cannot effectively represent Mr. Sacco" (id. at 8). Expressing her doubt as to Fischer's ability to represent Sacco zealously, she stated that "it's only fair for both defendants that they have attorneys that can be zealous advocates on their behalf and I think that's what the law requires, your Honor." (Id. at 9.) As to the latter point, the court stated, "I don't think the law requires zealousness on [the] part of the attorney. I think it requires adequacy on [the] part of the attorney. I know Mr. Fischer is more than adequate." (Id.)

Sacco himself took no firm position on Fischer's motion to withdraw. He expressed both admiration for and frustration with Fischer, saying he had "found Mr. Fischer to be sincere, genuine, intelligent, articulate," but had been "disappointed that our communication has not been continual in the last eight weeks." (Id. at 3.) However, Sacco also said he had an

> interest[] in going to trial as quickly as possible
> . . . . I want to get it behind me but I have no
> indication whatsoever that Mr. Fischer is actually
> ready at this time. I haven't discussed anything. I
> haven't seen any motions that he's put forth. I
> haven't received any replies from any of the letters
> that I sent him in the last eight weeks. When I read
> in the newspaper that a trial was taking place on the
> 28 of April, I was--it couldn't be true. I hadn't
> spoken to Mr. Fischer so I think there is a little

bit of an issue that he may not be ready, although I'd like to go, you know.

(Id. at 17.)

In a written order entered later on April 25, the court denied Fischer's motion to withdraw:

> Based upon the information contained in Defense counsel's ex parte motion, and the information obtained at the hearing held on April 25, 2008, the Court finds that there are insufficient grounds to warrant granting the application to withdraw. No actual conflict has been identified and the Court is confident, and expects, that Attorney Fischer will continue to provide Defendant Sacco with appropriate representation. Moreover, aside from some concerns about Attorney Fischer's preparation for trial, Defendant Sacco articulated that he was satisfied with Attorney Fischer's abilities. Without more, the information before the Court is insufficient to demonstrate an actual conflict warranting withdrawal. The motion to withdraw is, therefore, DENIED.

Order dated April 25, 2008 ("Order Denying Withdrawal"), at 1 (emphases added). The court gave the parties an extra week to prepare for trial, scheduling jury selection for May 5, 2008. (See id. at 1-2.)

On April 30, O'Connor, who previously had moved unsuccessfully for severance of her trial from that of Sacco (see Part II.D. below), renewed her motion for severance, stating that Fischer had an "internal conflict with representing his client," which would cause him to provide ineffective assistance to Sacco at trial (O'Connor Memorandum of Law dated April 30, 2008, at 2) and thereby prejudice O'Connor's case (see id. at 5). O'Connor also argued, based on statements by Sacco at the April 25 hearing, that "Fischer's assistance thus far [has] been objectively unreasonable"; that Fischer "ha[d], by his own admission, stated

- 18 -

that his assistance w[ould] continue to be inadequate"; and that "Fischer ha[d] expressed an unequivocal unwillingness and inability to conduct a cross-examination of the alleged victim." (Id.) O'Connor stated that "it would appear that Mr. Fischer has done almost nothing to prepare for trial," that he was guilty of an "utter failure to prepare," and that it was "highly unlikely" that Fischer would be prepared for trial on May 5. (Id.)

Fischer, in response to O'Connor's motion, did not take a position on severance but disputed all of her characterizations of his preparedness and his willingness to represent Sacco properly. With respect to preparedness, Fischer stated that except for three specified tasks, "I believe we are prepared to go to trial in this matter." (Letter from Kelly E. Fischer to Judge McAvoy dated April 30, 2008 ("April 30 Letter"), at 2.) With respect to O'Connor's ethics challenge, Fischer stated:

> I wish to make it clear that, while my personal, moral and religious beliefs do create some issues for me in the defense of this action, I do not now believe, and do not recall ever[] expressing, in words or substance, "an unequivocal unwillingness and inability to conduct a cross-examination of the alleged victim."

(Id. at 1.)

On this appeal, Sacco, represented by new counsel, contends that the district court's denial of Fischer's motion to withdraw "was necessarily colored by its view, expressed during the conference on the motion to withdraw, that the law does not require an attorney to act as a zealous advocate for his client,"

and was thus improper. (Sacco brief on appeal at 46.) He argues that

> Code of Professional Responsibility Canon 7, entitled "A Lawyer Should Represent a Client Zealously Within the Bounds of the Law," contains Ethical Consideration 7-1, stating "the duty of a lawyer, both to the client and to the legal system, is to represent the client zealously within the bounds of the law, which includes Disciplinary Rules and enforceable professional regulations," id., and Disciplinary Rule 7-101, expressly governing "Representing a Client Zealously." Id.

(Sacco brief on appeal at 47.) We see no basis for reversal--either in the arguments made by Fischer in the district court or in the arguments made by Sacco's new attorney on this appeal.

A ruling denying a motion to withdraw is reviewable for abuse of discretion. See United States v. Oberoi, 331 F.3d 44, 47 (2d Cir. 2003).

> We must grant considerable deference to the district court's decision especially when the prosecution of the suit is likely to be disrupted by the withdrawal of counsel. However, if forcing an attorney to continue representation will cause a violation of the Code of Professional Responsibility and possibly subject the attorney to sanctions, it will be an abuse of discretion not to grant the motion to withdraw.

Id. at 47-48 (internal quotation marks and citation omitted).

In the present case, Fischer did not argue, either in his sealed affirmation or in his statements in open court, that there was any Disciplinary Rule that would be violated if he continued to represent Sacco or that his continued representation of Sacco might possibly expose him to sanctions. As noted above, Fischer cited at the hearing former EC 2-30, which he characterized as dealing with whether an "attorney should seek to withdraw" because

of the "intensity of [his] personal feelings." (Sacco April 25 Tr. at 3.) That statement actually conflated EC 2-30, which concerned whether an attorney should accept an appointment, with former EC 2-29, which dealt with whether an attorney, having accepted an appointment, should seek to withdraw. The provision most relevant to Fischer's motion to withdraw was EC 2-29, which provided in pertinent part as follows:

> When a lawyer is appointed by a court . . . to undertake representation of a person unable to obtain counsel, whether for financial or other reasons, the lawyer should not seek to be excused from undertaking the representation except for compelling reasons. Compelling reasons do not include such factors as the repugnance of the subject matter of the proceeding[ or] . . . the belief of the lawyer that the defendant in a criminal proceeding is guilty . . . .

Code, EC 2-29 (emphases added). See also Fiumara v. United States, 727 F.2d 209, 212 (2d Cir.) ("A trial counsel worthy of the name should be capable of subordinating his personal predilections to his professional duty." (internal quotation marks omitted)), cert. denied, 466 U.S. 951 (1984).

Fischer's affirmation made clear that he had accepted appointment by the court to defend Sacco knowing the nature of the charges. He stated that he had proceeded industriously to prepare for trial, conducting interviews, doing research, and examining "100 pounds" of documents. The affirmation quite plainly stated that Fischer wished to withdraw because of his abhorrence of a "single bit" of evidence in the case. Ethical Consideration 2-29 provided that he should not seek to withdraw except for compelling reasons; and if, as EC 2-29 specified, repugnance of the subject

- 21 -

matter of the case does not fit into that category, Fischer's revulsion at a single item of evidence in the case surely did not constitute a compelling reason. Finally, Fischer's affirmation's reference to the change in his "technical perspective" (emphasis added) suggests that the condom evidence caused Fischer to believe that his client was guilty. Under the express terms of EC 2-29, such a belief is not a sufficient reason to withdraw.

We thus see no abuse of discretion in the district court's denial of Fischer's motion based on the presentations to the district court. Implicit in the court's statement that it "expect[ed] that Attorney Fischer w[ould] continue to provide Defendant Sacco with appropriate representation," Order Denying Withdrawal at 1 (emphasis added), was the expectation that Fischer would represent Sacco as vigorously as required by the Code. That expectation was entirely reasonable in light of the absence of any suggestion by Fischer in his motion that he would be unable to comply with any of the Code's Disciplinary Rules or any suggestion that his continued representation of Sacco might possibly expose him to a sanction. Further, Fischer made clear in the motion itself that he had done most of the work necessary to prepare for trial. And he indicated in his April 30 Letter that he was ready, able, and willing to proceed to trial and to cross-examine S.O. on Sacco's behalf.

Nor does Sacco's brief on appeal provide any basis for concluding that the district court should have granted Fischer's motion. Although it cites the title of DR 7-101 ("Representing a

Client Zealously"), it does not quote or describe any provision of that Rule and does not suggest that Fischer failed to comply with any of the Rule's commands. Further, while Sacco's brief quotes EC 7-1's provision that an attorney should "represent the client zealously," it provides no basis for a conclusion that Fischer did not represent Sacco zealously. His objections to Fischer's performance are to strategic decisions such as the timing of Fischer's objection to the admission of Sacco's self-styled autobiography and the timing of a request for a bench trial. The record makes plain that Fischer competently cross-examined S.O. at trial, and Sacco's brief on appeal does not contend to the contrary.

In sum, the record provides no basis for a conclusion that the denial of Fischer's motion to withdraw deprived Sacco of a fair trial.

B. Sacco's Other Challenges

1. The Admission of Excerpts From Sacco's Autobiography

At trial, the government offered in evidence eight passages from Sacco's autobiography, in which Sacco had written of his sexual attraction to children and described, inter alia, his sexual acts against "[his] little sister" and her girlfriends while they were asleep. The district court admitted four of the proffered excerpts in full, excluded three, and admitted only part of another. Sacco does not challenge the admissibility of the excerpts under Fed. R. Evid. 413 (authorizing the admission, in a

- 23 -

criminal case in which the defendant is accused of sexual assault, of relevant evidence of the defendant's commission of another offense or offenses of sexual assault), and Fed. R. Evid. 414 (authorizing the admission, in a criminal case in which the defendant is accused of child molestation, of relevant evidence of the defendant's commission of another offense or offenses of child molestation). Rather, Sacco contends that all of the passages should have been excluded pursuant to Fed. R. Evid. 403 on the ground that their potential for unfair prejudice substantially outweighed their probative value. Sacco, age 48 when he abused S.O., argues that the autobiography, written shortly before 2000, at most described his thoughts and conduct as a teenager, and thus that they lacked probative value because they were too remote in time. We reject this conclusion.

The trial court's decision not to exclude evidence pursuant to Rule 403 is reviewed only for abuse of discretion. See, e.g., United States v. Larson, 112 F.3d 600, 604-05 (2d Cir. 1997) ("Larson"). Courts confronted with remote-in-time evidence offered under Rule 413 or Rule 414 should conduct a fact-specific and case-specific analysis:

> Exclusion of proof of other acts that are too remote in time caters principally to the dual concerns for relevance and reliability. The evaluation of the proffered evidence in light of these concerns must be made on a case-by-case basis to determine whether the significance of the prior acts has become too attenuated and whether the memories of the witnesses has likely become too frail. Neither Rule 403 nor any analogous Rule provides any bright-line rule as to how old is too old.

Larson, 112 F.3d at 605. In Larson, we found no abuse of discretion in the admission of testimony about acts that occurred 16 to 20 years before the trial where "[t]he similarity of the events clearly demonstrated the . . . testimony's relevance." Id.; see also United States v. Davis, 624 F.3d 508, 512 (2d Cir. 2010) (no abuse of discretion in the admission of testimony about conduct occurring some 19 years earlier).

In the present case, the district court plainly conducted a Rule 403 balancing analysis; it excluded some of the proffered excerpts on the ground that they were cumulative or that their probative value was outweighed by the potential for unfair prejudice. (See Tr. 696.) The excerpts that were admitted plainly had high probative value that outweighed any potential for unfair prejudice; they included descriptions of Sacco entering rooms in which young girls were asleep and sexually molesting them--conduct that partially paralleled S.O.'s description of Sacco's first molestation of her. And an excerpt describing an interest in child pornography was consistent with S.O.'s testimony that Sacco forced her to pose for pornographic photographs.

Further, the present case does not involve the usual concerns as to memory or reliability; the passages had been written by Sacco himself. And although Sacco suggests that his predilections as a teenager should be discounted, pointing out that the acts described in his autobiography occurred more than 30 years before his conduct with S.O. and thus were more remote in time than the conduct at issue in the above cases, that argument

- 25 -

rings hollow in light of the evident relish with which he wrote the passages just seven years before his molestation of S.O. We see no abuse of discretion in the admission of this evidence.

2. The Denial of a Continuance

As indicated in Part I.B. above, Sacco's friend DiFiori testified at trial that Sacco had admitted having sex with a 12-year-old girl. Although DiFiori had been included in the government's list of planned witnesses, this aspect of his testimony had not been anticipated, as DiFiori did not inform the government of Sacco's statement until Friday May 9, 2008, the day DiFiori began his testimony. In light of the surprise testimony, Sacco asked the court to grant a mistrial, or, in the alternative, to strike that testimony from the record or adjourn the trial for at least a week in order to allow Sacco to conduct further investigation into DiFiori's background. O'Connor's attorney preferred not to have a mistrial and requested a curative instruction or a continuance of at least two weeks.

The trial court, accepting the representation of the Assistant United States Attorney that the government had had no prior indication that DiFiori would give this testimony, denied the defense motions. However, "want[ing] to make sure the witness is adequately cross-examined by everybody" (Tr. 548), the court did not require defendants to proceed with their cross-examinations and instead adjourned the trial early that Friday afternoon in order to give them the remainder of that day plus the

weekend to prepare to cross-examine DiFiori as to Sacco's statement. On appeal, Sacco contends principally that the denial of a week-long continuance violated his due process and confrontation rights. We are unpersuaded.

The decision whether to grant a continuance is a matter "traditionally within the discretion of the trial judge." Ungar v. Sarafite, 376 U.S. 575, 589 (1964). We review an order denying a continuance for abuse of discretion, and we will find no such abuse unless the denial was an "arbitrary action that substantially impaired the defense." United States v. Beverly, 5 F.3d 633, 641 (2d Cir. 1993). The burden of showing such an impairment is on the party complaining of the lack of a sufficient continuance. See, e.g., United States v. Tin Yat Chin, 476 F.3d 144, 146 (2d Cir. 2007) (new trial not required where defendant was "unable to specify with any particularity how he was prejudiced by not receiving a longer [than one-day] continuance").

We see no arbitrary action or substantial impairment here. The surprise testimony was quite succinct and entirely straightforward. Sacco offers no explanation as to why the extra time on that Friday plus the weekend recess were not sufficient to permit him to prepare an adequate cross-examination, except to state that he needed more time to investigate DiFiori's background. But the fact that DiFiori was to testify at trial had been known to the defendants in advance; presumably they would have conducted at least some investigation into his background in preparation for his expected testimony. And although Sacco

contends that further investigation was warranted in light of the unexpectedly damaging testimony, he provides no inkling of what helpful information might have been found.

We also reject Sacco's contention that "DiFiori's testimony was essential to proving . . . that [Sacco] had engaged in sexual intercourse with S.O. when she was twelve years old" (Sacco brief on appeal at 61). Although a direct admission is virtually always damaging, we have no doubt that Sacco would have been convicted without his statement to DiFiori, given S.O.'s explicit testimony and the used condom bearing S.O.'s DNA, which was found among Sacco's stored possessions.

## C. O'Connor's Challenges to the Sufficiency of the Evidence

At trial, defendants cross-examined S.O. at length, emphasizing that when Sacco first began abusing her, S.O. did not tell her mother; that when S.O. first told Chesebro and Detective Blenis about Sacco, she did not tell them she had also been abused by her mother or by George Lang; and that some details of her testimony--such as the months in which various incidents occurred--differed from statements she had previously given to DSS caseworkers or to Blenis. O'Connor challenges the sufficiency of the evidence to convict her on any count, arguing generally that S.O.'s testimony was inconsistent, contradictory, and not credible, and that the jury's verdict was against the weight of the evidence. She also contends, inter alia, that particular elements of the three offenses of which she was found guilty were

- 28 -

not supported by sufficient evidence. We find no merit in her sufficiency challenges.

O'Connor's general contentions are contrary to well established principles governing review of challenges to the sufficiency of the evidence. In considering such a challenge, we must credit every reasonable inference that the jury could have drawn in the government's favor, see, e.g., United States v. Carson, 702 F.2d 351, 361 (2d Cir.) ("Carson"), cert. denied, 462 U.S. 1108 (1983), and we must affirm the conviction so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt, see, e.g., United States v. Buck, 804 F.2d 239, 242 (2d Cir. 1986); United States v. Taylor, 464 F.2d 240, 244-45 (2d Cir. 1972). The weight of the evidence is a matter for argument to the jury, not a ground for reversal on appeal. See, e.g., United States v. Roman, 870 F.2d 65, 71 (2d Cir.), cert. denied, 490 U.S. 1109 (1989).

"Where there are conflicts in the testimony, we must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses." United States v. Persico, No. 08-5266, 2011 WL 1661420, at *16 (2d Cir. May 3, 2011); see, e.g., United States v. Morrison, 153 F.3d 34, 49 (2d Cir. 1998). "[W]hen testimonial inconsistencies are revealed on cross-examination, the jury [i]s entitled to weigh the evidence and decide the credibility issues for itself . . . ." United States v. Josephberg, 562 F.3d 478, 494 (2d Cir.) (internal quotation marks omitted), cert denied, 130 S. Ct. 397 (2009). "It is the

- 29 -

province of the jury and not of the court" to determine whether a witness who may have been "inaccurate, contradictory and even untruthful in some respects" was nonetheless "entirely credible in the essentials of his testimony." United States v. Tropiano, 418 F.2d 1069, 1074 (2d Cir. 1969), cert. denied, 397 U.S. 1021 (1970); see, e.g., United States v. Coté, 544 F.3d 88, 99 (2d Cir. 2008) ("court must give full play to the right of the jury to determine credibility").

In the present case, S.O. testified that she did not mention O'Connor in her early disclosures with regard to Sacco because she feared that, upon her return to O'Connor's custody, there would be repercussions if she had disclosed the abuse by O'Connor. She also explained that for the same reason, in her early disclosures, she had not mentioned being abused by George Lang because to do so would implicate her mother. She testified, "It's not that I wasn't truthful. I was scared to say everything." (Tr. 1636 (emphasis added).) It was well within the province of the jury to consider all of the evidence, and to conclude that S.O.'s early disclosures were merely incomplete and that her trial testimony was truthful. In light of the above principles, O'Connor's overarching contentions that her convictions should be reversed on the grounds that S.O.'s testimony was not credible or was contrary to testimony of other witnesses, or that the guilty verdicts against her were against the weight of the evidence, provide no basis for reversal.

- 30 -

Nor, as discussed below, is there merit in O'Connor's more particularized sufficiency challenges focusing on specific counts.

1. Count 1

With respect to Count 1, O'Connor contends that the government failed to prove that she acted with the knowledge or intent required to support a conviction for selling a child for the purpose of producing child pornography, in violation of 18 U.S.C. § 2251A(a). That section, as it read in 2006-2007, applied, to the extent pertinent here, to

> [a]ny parent . . . of a minor who sells or otherwise transfers custody or control of such minor, or offers to sell or otherwise transfer custody of such minor either--
>
> (1) with knowledge that, as a consequence of the sale or transfer, the minor will be portrayed in a visual depiction engaging in, or assisting another person to engage in, sexually explicit conduct; or
>
> (2) with intent to promote either--
>
> (A) the engaging in of sexually explicit conduct by such minor for the purpose of producing any visual depiction of such conduct; or
>
> (B) the rendering of assistance by the minor to any other person to engage in sexually explicit conduct for the purpose of producing any visual depiction of such conduct . . . .

18 U.S.C. § 2251A(a) (2006).

As set out in Part I.A.2. above, S.O. testified that O'Connor, inter alia, helped Sacco take pornographic photographs of S.O in November 2006, and that in the months that followed,

- 31 -

O'Connor continued to send S.O. to the upstairs apartment with Sacco. Although O'Connor seizes on various alleged discrepancies in S.O.'s testimony--asserting, for example, that whereas S.O. testified at trial that O'Connor helped Sacco take pornographic photographs of S.O. in November 2006, she had earlier suggested that the incident occurred in October--it plainly was within the province of the jury to find that the event described by S.O. did occur. The contention that the evidence was insufficient to permit the jury to infer that O'Connor had the knowledge or intent envisioned by the statute is meritless.

O'Connor also argues that the jury's verdict of guilty on Count 1 was inconsistent with its verdict finding her not guilty on Count 7, which charged her with possession of child pornography. This argument is doubly flawed. First, inconsistent verdicts are not a ground for reversal; our review of whether evidence was sufficient to support a conviction on one count is "independent of the jury's determination that evidence on another count was insufficient." United States v. Powell, 469 U.S. 57, 67 (1984). Second, there was no inconsistency, as possession of child pornography is not an element of a § 2251A(a) offense.

2. Count 3

O'Connor contends that there was insufficient evidence to support her Count 3 conviction of sex trafficking of a minor, in violation of 18 U.S.C. § 1591. That section applied, in pertinent part, to anyone who knowingly,

in or affecting interstate or foreign commerce, . . . recruits, entices, harbors, transports, provides, or obtains by any means a person[,]

. . . .

knowing . . . that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act,

18 U.S.C. § 1591(a) (Supp. III 2003), and provided enhanced penalties if, at the time of the offense, the minor was under the age of 14 years, see id. § 1591(b)(1). As the indictment charged that this offense was committed "[b]etween in and about January of 2004 through March of 2007," this count encompassed any of the abuse of S.O. described in Part I.A. countenanced, supported, or arranged by O'Connor. O'Connor contends that there was no proof that S.O.'s sex acts had any commercial aspect.

Without considering the evidence as to the sexual abuse by George Lang, who sometimes helped O'Connor to pay her rent, or as to the two strangers with whom O'Connor caused S.O. to have sex at the Best Western in exchange for money, we think it clear that the evidence of O'Connor's collaboration with Sacco was sufficient to support her conviction under § 1591(a). There is no dispute that during much of the period in question O'Connor was behind in paying rent (see O'Connor brief on appeal at 76-77; see also Tr. 2010-11); S.O. testified that when Sacco, who lived in New Jersey, came to 45 Fair in Norwich, New York, O'Connor, inter alia, repeatedly sent her upstairs with Sacco to the vacant apartment where Sacco abused S.O.; and when S.O. complained after the first such abuse in that apartment, O'Connor's response was that it

- 33 -

"[wa]s better than being homeless." From this evidence the jury could easily find that O'Connor provided the 12-year-old S.O. to Sacco, arriving from out of state, to have her engage in sex acts in exchange for his forbearance with respect to her nonpayment or deferred payments of rent or discounted rent.

3. Count 5

With respect to her Count 5 conviction for permitting S.O. to be used in the production of child pornography, O'Connor contends that the government failed to present sufficient evidence of the interstate commerce element of 18 U.S.C. § 2251(b). That section applied, in pertinent part, to

> [a]ny parent . . . having custody or control of a minor who knowingly permits such minor to engage in, or to assist any other person to engage in, sexually explicit conduct for the purpose of producing any visual depiction of such conduct . . . if that visual depiction was produced using materials that have been mailed, shipped, or transported in interstate . . . commerce.

18 U.S.C. § 2251(b) (2006) (emphases added).

S.O. testified that in late October 2006, on the first occasion on which Sacco abused her in the vacant upstairs apartment, he took pornographic pictures of her with a camera that had a zoom lens. When Sacco thereafter abused her on Thanksgiving, O'Connor photographed them, using a camera that S.O. believed was the same one Sacco had used previously. S.O. had never seen her mother with such a camera and did not believe it belonged to O'Connor. (See Tr. 1529-30.) The government introduced evidence that Sacco had bought a camera with zoom

capability on eBay in May of that year and had had it shipped to him in New Jersey. (See id. at 1852-53.) This evidence was ample to permit the jury to find that the camera O'Connor used was one that Sacco had brought to New York from New Jersey.

D. O'Connor's Challenge to the Denial of Severance

Prior to trial, O'Connor moved pursuant to Fed. R. Crim. P. 14(a) for an order of severance, allowing her to be tried separately from Sacco on the ground, principally, that the proof against Sacco, including evidence of his pedophilic past, was overwhelming and extremely disturbing, making it likely to cause prejudicial spillover into the jury's consideration of the evidence against O'Connor. She also argued, without specificity, that her defense was unreconcilable with that of Sacco. The district court denied the motion, noting that the case was not unduly complicated and that most of the witnesses, including S.O., would be testifying against both Sacco and O'Connor. The court concluded that, given proper instructions, "[t]he likelihood of a jury confusing the evidence against O'Connor with the evidence against Sacco [wa]s minimal . . . ." (Transcript of Proceedings as to Linda O'Connor, April 25, 2008, at 15.)

O'Connor again moved for severance after the district court's refusal to allow Sacco's attorney to withdraw, see Part II.A. above. She predicted that because Fischer preferred not to proceed, his performance in representing Sacco would be poor; and she argued that his poor performance in representing Sacco would

prejudice her. The district court denied this motion without comment.

On appeal, O'Connor contends that the denial of her severance motions raising the above grounds deprived her of a fair trial. She also contends that she was unfairly prejudiced by her inability to question Sacco about DiFiori's testimony as to Sacco's admission of having had sex with a 12-year-old prostitute--an argument that was not made in the severance motions because when those motions were made, neither the defendants nor the government were aware that DiFiori would so testify. We conclude that each of O'Connor's contentions lacks merit in light of the relevant legal principles.

"There is a preference in the federal system for joint trials of defendants who are indicted together." Zafiro v. United States, 506 U.S. 534, 537 (1993). "Joint trials 'play a vital role in the criminal justice system,'" as "[t]hey promote efficiency and 'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts,'" id. (quoting Richardson v. Marsh, 481 U.S. 200, 209, 210 (1987)), and they avoid "requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying," Richardson, 481 U.S. at 210.

The possibility that codefendants may mount mutually antagonistic defenses is not itself a ground for severance where the risk of prejudice can be offset by "less drastic measures" devised by the district court, "such as limiting instructions,"

_Zafiro_, 506 U.S. at 539; _see_, _e.g._, United States v. Losada, 674 F.2d 167, 171 (2d Cir.) ("_Losada_"), _cert. denied_, 457 U.S. 1125 (1982). Nor is severance necessarily required by "the fact that evidence may be admissible against one defendant but not another," _Carson_, 702 F.2d at 367; _see_, _e.g._, _Losada_, 674 F.2d at 171, especially where the charges against the defendants are straightforward and the jury is properly instructed to consider the evidence against each defendant separately, _see_, _e.g._, _Carson_, 702 F.2d at 367; _Losada_, 674 F.2d at 171. There is a strong indication that there has been no prejudicial spillover "where the jury has convicted a defendant on some counts but not on others." United States v. Hamilton, 334 F.3d 170, 183 (2d Cir.), _cert. denied_, 540 U.S. 985 (2003); _see_, _e.g._, _Carson_, 702 F.2d at 367.

Further, given the interests of judicial economy, a defendant's professed desire to elicit trial testimony from a codefendant does not require a severance where there is no showing of a likelihood that the codefendant would waive his Fifth Amendment privilege and testify at a severed trial or where, if the codefendant testified, it is likely that his testimony would be subject to damaging impeachment. _See generally_ United States v. Wilson, 11 F.3d 346, 354 (2d Cir. 1993), _cert. denied_, 511 U.S. 1025 (1994); United States v. Taylor, 562 F.2d 1345, 1362-63 (2d Cir.), _cert. denied_, 432 U.S. 909 (1977); _see also_ United States v. Bari, 750 F.2d 1169, 1177 (2d Cir. 1984) ("_Bari_") (the fact that the defendant had not pleaded guilty "indicat[ed that he was] unlikely to waive the privilege against self-incrimination at a

separate trial unless [he] had already been acquitted"), cert. denied, 472 U.S. 1019 (1985).

We review the denial of a severance motion under an abuse-of-discretion standard. See, e.g., Zafiro, 506 U.S. at 538-39; Carson, 702 F.2d at 366; Losada, 674 F.2d at 169, 171. We will find such an abuse only where the denial caused the defendant "substantial prejudice . . . amounting to a miscarriage of justice." Bari, 750 F.2d at 1177 (internal quotation marks omitted); see, e.g., United States v. Rivera, 546 F.3d 245, 253 (2d Cir. 2008), cert. denied, 129 S. Ct. 1395 (2009); United States v. Blakney, 941 F.2d 114, 116 (2d Cir. 1991).

We see no abuse of discretion or miscarriage of justice here. The nature of the charges in the present case made the joint trial of O'Connor and Sacco particularly appropriate. O'Connor was charged with selling S.O. to Sacco for the purpose of producing child pornography; Sacco was charged with buying S.O. from O'Connor for that purpose. With respect to the sex trafficking of S.O., and with respect to using her to produce child pornography, each defendant was charged with committing each of those crimes and with aiding and abetting their commission. Thus, much of the evidence, including virtually all of the disturbing testimony given by S.O. about being abused and photographed by Sacco, would have been admissible at a trial of O'Connor alone. And given the sordid nature of the case, it was appropriate to avoid unnecessarily subjecting S.O. to the trauma of having to give her trial testimony more than once.

Although one of O'Connor's arguments is that a joint trial was unfair on the ground that her defense and the defense presented by Sacco were mutually antagonistic, we reject her factual premise. Both O'Connor and Sacco defended principally by attempting to show flaws or inconsistencies in S.O.'s statements and by arguing that her testimony simply was, as Sacco's attorney "put it very kindly, unreliable" (Tr. 2239), or, as he put it less kindly, "fabricated" (id. at 2240) and "false" (id. at 2241). O'Connor's attorney in her summation termed S.O.'s testimony a "masterpiece" (id. at 2340) of consciously devious, attention-seeking, autobiographical fiction (see id. at 2316-40) that should be "entitled American Dream Girl" (id. at 2316). O'Connor's attorney stated that "[t]he government's case can be summed up in five words. Sex, lies, and no videotape." (Id. at 129.)

To explain why S.O. would testify falsely, O'Connor's attorney, in her opening and her summation, argued in part that S.O. sought attention. (See, e.g., Tr. 102 ("[S.O.] has said in desperation what she thought those around her wanted to hear in order to give her the attention that she was seeking . . . ."); id. at 105 ("Clearly [S.O.] is starving for attention."); id. at 2319 (S.O. enjoyed "all the attention" she received after telling camp counselors that she had taken her mother's medication); id. at 2332 (arguing that S.O. was thinking, "Every time I said something I'd get a lot of attention. For a 13-year-old kid that was pretty cool."); id. at 2337 (arguing that S.O.

was excited to testify because she had "an entire entourage" including a bodyguard and "really felt like a celebrity").)

In his summation, Sacco's attorney too argued that S.O. had perhaps intentionally fabricated her testimony because she wanted attention. (See Tr. 2241 ("Why would she make a false claim if it in fact is false? Why would she do that? There are rewards to it. There is an upside to it. You get a bodyguard; that's one reward. You get a lot of people who really, really genuinely care.").) He also offered the alternative that S.O.'s testimony might have been the product of confusion, either because she conflated a variety of events (see id. at 2284 ("She is confused[,] . . . tak[ing] bits and pieces from events and mix[ing] them up and they come out in some sort of story")); or because she had viewed pornography while living at Renee Lang's home in mid-August to mid-October of 2006 and had "fantas[ized]" events (id. at 2245); or because she was under the influence of mind-altering medications (see, e.g., id. (arguing that S.O.'s statement to the authorities in December 2007--the first instance of her accusing O'Connor of incest and of prostituting S.O. at the Best Western--"[wa]s made at a time when she is at the very least confused and at the most severely mentally ill, psychotic, hallucinating and under the influence of not Zoloft or Benadryl but Thorazine, Risperdal, which are . . . some very seriously heavy-duty antipsychotic medications")).

The defense positions argued by O'Connor and Sacco thus were not mutually antagonistic. The arguments plainly overlapped,

- 40 -

and the jury's acceptance of any of them would have benefited both defendants.

As to O'Connor's concern for the possibility of spillover from the evidence against Sacco, it is true that the proof as to his past pedophilic conduct and appetites--presented through the testimony of one of his victims, the testimony of a police officer to whom Sacco made admissions, and the descriptions in Sacco's own autobiography--might well have been excluded in a trial of O'Connor alone. But the district court gave the jury appropriate instructions to minimize any possibility of prejudicial spillover. For example, before the attorneys made their opening statements, the court instructed the jury that although O'Connor and Sacco were being tried together, the jury would be required to consider "each charge separately" with respect to "each defendant separately" (Tr. 26, 44). In its final charge to the jury, the court repeatedly reiterated these instructions. (See, e.g., id. at 2396 (reminding the jurors to analyze the evidence "as to the particular defendant you're considering . . . without regard to the guilt or innocence of other people"); see also id. at 2397, 2411, 2427.) We see no reason to believe that the jury did not follow these instructions. The fact that it found O'Connor not guilty on two of the counts against her strongly indicates that she was not unfairly prejudiced by the evidence that had been introduced only against Sacco. Indeed, the evidence as to Sacco's past conduct was hardly more inflammatory than the evidence of the

fact that, and of the manner in which, O'Connor herself repeatedly committed incest against and prostituted her young daughter.

Nor are we persuaded that O'Connor is entitled to a new trial on the ground that being tried jointly with Sacco prevented her from examining Sacco with respect to DiFiori's testimony that Sacco had admitted having sex with a 12-year-old prostitute. Sacco here chose to stand trial and not to testify in his own behalf; O'Connor has proffered no reason to believe that he would waive his Fifth Amendment privilege in order to testify at a trial of O'Connor alone. Further, O'Connor's brief on appeal is silent as to what testimony she would have hoped to elicit from Sacco if she had been able to examine him about the statement attributed to him--and it offers no basis for assuming that whatever responses she might elicit would not be entirely overcome by the evidence that O'Connor herself repeatedly caused S.O. to have sex with Sacco, that O'Connor herself sometimes participated with Sacco in the sexual abuse of S.O., and that Sacco had in his possession a used condom bearing S.O.'s DNA.

Finally, we find no merit in O'Connor's additional contention that the denial of her severance motions deprived her of a fair trial because of allegedly nonzealous performance by Sacco's attorney. Poor trial performance by one defendant's attorney does not cause a codefendant substantial prejudice where the jury was instructed properly, where no evidence suggested that the lawyer's behavior caused juror animus toward the codefendant, and where each defendant "received ample opportunity to present

- 42 -

his claims to the jury unobstructed by any conduct on the part of" the allegedly poor attorney. United States v. Bubar, 567 F.2d 192, 205 (2d Cir.), cert. denied, 434 U.S. 872 (1977). On the record before us, we cannot conclude that Fischer's performance in representing Sacco was poor. And we see no indication that Fischer distracted or alienated jurors, or that he in any way prejudiced the defense of O'Connor, who was independently represented--and who was acquitted on two of the counts against her.

E. O'Connor's Evidentiary Contentions

O'Connor also contends that the district court erred in certain of its evidentiary rulings, principally (1) in excluding evidence that, in being interviewed by the police, she asked to be given a polygraph test, and (2) in admitting testimony by Renee Lang about a note written by S.O. The trial court's evidentiary rulings are reviewed for abuse of discretion, see, e.g., Old Chief v. United States, 519 U.S. 172, 174 n.1 (1997), and we are to disregard "[a]ny error, defect, irregularity, or variance that does not affect substantial rights," Fed. R. Crim. P. 52(a); see also, United States v. Garcia, 413 F.3d 201, 210 (2d Cir. 2005); Fed. R. Evid. 103(a). We find no basis for reversal in either ruling.

The first contention does not warrant extended discussion. O'Connor sought to present evidence that in a November 2007 interview with Detective Blenis she had stated that

she did not want to speak to him again without taking a "lie[-]detector test"; O'Connor offered that statement to show her "state of mind." (Tr. 250-53.) The district court excluded it on the ground of relevance. We agree that O'Connor's state of mind at the time of her interview with Blenis--many months after the allegedly unlawful conduct--was not relevant.

O'Connor's second contention is that the court should have excluded testimony by Renee Lang that she found, while cleaning out the room in which S.O. had slept during her two-month stay with Renee in 2006, a note in S.O.'s handwriting stating, "'I hate my mother. She used me'" (Tr. 1307). Renee testified that the note itself had since been "misplaced" or "thr[own] out." (Id. at 1301.) Over O'Connor's objections on the ground that the note itself was not offered and that the statements it contained were hearsay, the court admitted the testimony as (1) the "best evidence," in light of the loss of the note, and (2) an exception to the hearsay rule as evidence of S.O.'s state of mind. We find no basis for reversal.

We see no error in the first part of the court's ruling. Where all originals of a writing have been lost or destroyed, other than as a result of bad faith on the part of the proponent of the evidence, the trial court may allow the introduction of secondary evidence. See, e.g., Fed. R. Evid. 1004(1); United States v. Ross, 321 F.2d 61, 70 (2d Cir.), cert. denied, 375 U.S. 894 (1963). There was no showing of bad faith on the part of the government (or of Renee) in this case.

Nor do we see error in the rejection of O'Connor's hearsay objection, although our reasoning only partially parallels that of the district court. The district court relied on the principle that a hearsay statement is not excludable under the hearsay rule if it is

> [a] statement of the declarant's then existing state of mind[ or] emotion, . . . but not including a statement of memory or belief to prove the fact remembered or believed,

Fed. R. Evid. 803(3). We agree that the portion of S.O.'s note stating that S.O. hated O'Connor--to the extent it was offered for its truth--was hearsay and was within this exception. The Rule 803(3) exception did not, however, cover the portion of the note stating that O'Connor had "'used'" S.O., for that part was not a statement of S.O.'s state of mind. Nonetheless, admission of the "'She used me'" portion of the note was not error because that part was not hearsay. Rule 801(d) provides in part as follows:

> A statement is not hearsay if . . . [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication . . . .

Fed. R. Evid. 801(d)(1)(B). See, e.g., United States v. Gonzalez, 700 F.2d 196, 202 (5th Cir. 1983) (ruling that it was error for the trial court to exclude the defendant's out-of-court statement, offered by the defendant under Rule 801(d)(1)(B) "in anticipation of the government's inevitable attack on [the defendant's] own testimony"); see also id. at 202-03 (finding the error harmless).

- 45 -

Here, O'Connor and Sacco had begun their attacks on the credibility of S.O.'s expected testimony in their opening statements and accused her of belatedly fashioning the allegations of sexual abuse by O'Connor. For example, O'Connor's attorney in her opening statement argued that during more than a year of complaining about Sacco, S.O. made no allegations of sexual abuse by O'Connor. She argued that it was not until "October 25[, 2007, that S.O.] starts saying I have more to tell. I have more to tell about my mother, it's going to get her in trouble" (Tr. 120 (emphases added)), and not until October 29, 2007, that S.O. says O'Connor "was having sex with me. She was taking pictures. . . . It's at this point in time where she brings up this notion that her mom was taking photographs of her while she's having sex with [Sacco]" (id. at 121 (emphasis added)); and that on November 30, 2007, S.O. is "claiming now . . . I have more to tell about my mom. . . . And during that interview [S.O. says George Lang] sexually abused me. My mother sexually abused me" (id. at 122-23 (emphases added)).

Plainly, defendants contended that S.O.'s trial testimony about O'Connor represented fabrications originating in late 2007, and they argued that her statements to social workers and/or Detective Blenis from October 2006 to late October 2007, which omitted any charge of incest or sex trafficking by O'Connor, were the more accurate and truthful. Equally plainly, a statement made by S.O. not later than mid-October 2006 that O'Connor had "'used'" her was consistent with S.O.'s trial testimony that George Lang

had helped O'Connor to pay the rent and that O'Connor had required S.O. to engage in sexual activities with Lang in 2004. Although Renee's testimony about the note was admitted before S.O. was called to testify, it was clear that S.O. was to be--and was--the principal witness at trial and could be cross-examined by the defense about the statement in her note. Accordingly, in light of Rule 801(d)(1)(B), we see no error in the trial court's admission of Renee's testimony that S.O., in a note written in 2006, stated that O'Connor "'used'" her.

## CONCLUSION

We have considered all of defendants' contentions on these appeals and have found them to be without merit. The judgments of conviction are affirmed.